FILED

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

2017 OCT 13 AM 9: 45

CLERK U.S. DISTRICT
MIDDLE DISTRICT OF FLA
JACKSONVILLE FLA

| |
|---|
| DAVE MOLLOY, derivatively on behalf of RAYONIER, INC., |
|                              Plaintiff, |
| v. |
| PAUL G. BOYNTON, NANCY LYNN WILSON, HANS VANDEN NOORT, C. DAVID BROWN, II, MARK E. GAUMOND, JAMES H. MILLER, THOMAS I. MORGAN, and RONALD TOWNSEND, |
|                              Defendants, |
| and |
| RAYONIER INC., a North Carolina Corporation, |
|                              Nominal Defendant. |

Civil Action No.
3:17-cv-1157-J-20MCR

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Dave Molloy ("Plaintiff"), by and through his undersigned counsel, respectfully submit this Verified Stockholder Derivative Complaint on behalf of nominal defendant Rayonier Inc. ("Rayonier" or the "Company") against certain of its directors and officers named herein (the "Individual Defendants" as defined below, and collectively with Rayonier, the "Defendants").

Plaintiff bases his allegations on personal knowledge as to his own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including, among other things, review and analysis of: (a) public filings made by Rayonier with the United States Securities and Exchange Commission ("SEC"); (b) press releases, postings on Rayonier's website and other publications caused or allowed to be disseminated by the Company; (c) news articles,

analyst reports and other public documents; and (d) over 1.5 million pages of nonpublic documents produced by Rayonier to Plaintiff.

## INTRODUCTION

1.      For years, the officers and directors of Rayonier, a timberland real estate investment trust ("REIT"), engaged in a scheme to inflate the Company's financial results by overharvesting its Pacific Northwest timberlands while simultaneously claiming the Company's harvests were well below sustainable levels, deferring merchantable timber inventory for future harvests.  For example, on October 26, 2010, defendant Paul G. Boynton ("Boynton"), Rayonier's former President and Chief Executive Officer ("CEO"), publicly represented that due to unfavorable saw log market prices the Company "will continue to defer approximately 30% of our sustainable [Pacific Northwest] harvest levels in 2010 to preserve value", in effect, stockpiling merchantable timber inventory to harvest in future periods.  In reality, for about a decade, the Individual Defendants caused Rayonier to engage in systematic overharvesting of its timberlands in the state of Washington, a critical part of the Company's Pacific Northwest region, by an average of 44% each year in excess of the true sustainable harvest level.  The Individual Defendants also caused Rayonier to artificially inflate its financial results by improperly including in publicly reported merchantable timber inventory timber located in restricted or environmentally sensitive areas and economically inaccessible swamplands.

2.      This scheme was carried out by defendant Boynton, defendant Hans Vanden Noort ("Vanden Noort"), its former Senior Vice President and Chief Financial Officer ("CFO"), and defendant Nancy Lynn Wilson ("Wilson"), its former Executive Vice President ("EVP") of Forest Resources, with active participation of additional executive officers of Rayonier.  Boynton, Vanden Noort, Wilson and other executives used inflated financial results to reap bonus and incentive compensation to which they would not have otherwise been entitled.  Furthermore, the

then-members of Rayonier's Board of Directors (the "Board"), completely neglected or ignored the Pacific Northwest Region harvesting practices, inventory levels, species, age classes, harvest plans and wood flows, despite numerous red flags of the Company's overharvesting.  Thus, the members of the Board abdicated their responsibility to make a good faith effort to oversee the Company's operations, internal controls, and financial reporting processes, failing to take any corrective action despite receiving regular reports on the Company's Long Range Plan ("LRP") and Pacific Northwest operations and harvests.

3.      Rampant overharvesting in the Pacific Northwest persisted at least until Boynton left Rayonier on June 27, 2014 to become CEO of Rayonier Advanced Materials, Inc. ("RAYM"), a new company formed in the spin-off of Rayonier's Performance Fibers business segment (the "Separation").  Boynton collected $5.65 million in bonuses from Rayonier on his way out the door, leaving the mess behind for Rayonier shareholders to bear the costs and consequences.

4.      At or about the time of the first Board meeting following the Separation, July 18, 2014, David Nunes ("Nunes"), as new CEO, commissioned a "review of the Company's operations and business strategies" because of, among other things, his ████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

5.      On August 22, 2014, Nunes reported to the then-current members of the Board the issues flagged by his review of the Company's operations and business strategies concerning, among other things, Rayonier's historical Pacific Northwest timber harvest levels and internal controls over estimates of merchantable inventory.  Thus, at its August 22, 2014 meeting, the Board approved the engagement of the outside law firm Jones Day to conduct an independent

investigation (internally referred to as "Project Longleaf"). Forensic accountants, management consultants, financial consultants, and crisis communications consultants were subsequently retained to assist with Project Longleaf.

6.     Results of the independent investigation were that the Company was drastically overharvesting. In particular:

> The average harvest level in the Pacific Northwest Region during 2004 to 2013 exceeded the rate those timberlands could support. The Company was harvesting 228 MMBF (or 1.8 million tons) per annum from its Pacific Northwest timberlands when those timberlands could sustain per annum harvests of 160 MMBF (or 1.3 million tons). To allow the overharvested Pacific Northwest timberlands to replenish, Rayonier planned to reduce harvest levels to 125 MMBF (or 1.0 million tons) per annum for five to ten years.

> There was a material weakness in Rayonier's internal controls related to merchantable timber inventory during 2013 through September 30, 2014. The Company included in merchantable timber inventory, timber in specially designated parcels located in restricted, environmentally sensitive or economically inaccessible areas. Representing such timber as merchantable was contrary to Rayonier's historical definition of merchantable timber inventory and caused, among other things, the material overstatement of income from continuing operations for the periods ended March 31, 2014 and June 30, 2014.

> On November 7, 2014, Rayonier management recommended and the Audit Committee of the Board concluded the Company's financial statements for the quarters ended March 31, 2014 and June 30, 2014 should not be relied upon. The Company would restate its financial statements and amend its filings with the SEC. Defendant Wilson resigned from her position as EVP, Forest Resources effective November 7, 2014.

> Because Rayonier expected less cash available for distribution due to lower expected annual harvest levels, on November 7, 2014, the Board reduced the fourth quarter dividend 17% to $0.25 per common share compared to the third quarter dividend of $0.30 per common share.

7.     The Individual Defendants' misconduct was finally revealed in November 2014 when the Company publicly disclosed that "for roughly a decade, Rayonier had been harvesting timber in Washington at an average rate that exceeded the rate those timberlands could support on

a long term basis." As a result, the Company had to drastically decrease its annual harvest levels in order to preserve the value of Company assets.

8.      The Individual Defendants' misconduct detailed herein constituted a breach of fiduciary duties owed to Rayonier and resulted in the unjust enrichment of at least defendants Boynton, Vanden Noort and Wilson. As a result of this breach, the Company has sustained damages, as alleged herein, including, without limitation, the costs of restating its financial statements, responding to an SEC investigation, defending a securities class action, and waste of assets.

9.      Plaintiff made a pre-suit litigation demand upon the Board to initiate litigation in 2015 against those responsible for the wrongdoing detailed herein. To date, the Board has not brought the demanded litigation. Plaintiff now brings this derivative action for the benefit of Rayonier to recover the Company's damages, cause the implementation of internal control and governance practice reforms, and compel certain of the Individual Defendants to disgorge to Rayonier the improper benefits they received.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1), as all Defendants have diversity of citizenship with Plaintiffs, and the amount in controversy exceeds $75,000, exclusive of interest and costs. In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.      This Court has personal jurisdiction over all Defendants because they either reside in this jurisdiction or have a substantial connection to this forum through their positions at Rayonier and were involved in many of the relevant events addressed herein and occurring in Jacksonville, Florida, or otherwise in this district.

5

12.     Venue is proper under 28 U.S.C. § 1391 because Rayonier maintains its headquarters in this judicial district and a substantial part of the events and omissions giving rise to this action occurred in this judicial district.  In addition, one or more of the Defendants either reside in, or maintain offices in, this district.

## THE PARTIES

13.     Plaintiff Dave Molloy ("Malloy") is a holder of shares of Rayonier common stock, was a holder of shares of Rayonier common stock at the time of the wrongdoing alleged herein, and has been a holder of shares of Rayonier common stock continuously since that time.  Malloy is a citizen of the State of Ohio. *See* Verification, attached hereto as Exhibit B.

14.     Nominal defendant Rayonier is a corporation duly organized and existing under the laws of the State of North Carolina.  Rayonier maintains its headquarters at 1 Rayonier Way, Yulee, Florida.  Accordingly, Rayonier is a citizen of North Carolina and Florida.  The Company's stock trades on the New York Stock Exchange under the ticker symbol "RYN."

15.     Defendant Boynton served as Rayonier's President and CEO from January 2012 until the Separation and Chairman of Rayonier's Board of Directors (the "Board") from May 2012 until the Separation, at which time he resigned from his positions at Rayonier and became President, CEO and Chairman of RYAM.  Prior to becoming Rayonier's CEO, defendant Boynton served in various executive roles at the Company, including, *inter alia*, Executive Vice President of Forest Resources and Real Estate from 2009 to 2010 and President and Chief Operating Officer ("COO") from 2010 to 2011.  Defendant Boynton received a $1.65 million transaction bonus and another $4 million in cash and common stock pursuant to his "special stock agreement" in connection with the Separation.  Upon information and belief, defendant Boynton is a citizen of the State of Florida.

6

16.     Defendant Wilson served as Rayonier's Executive Vice President of Forest Resources from January 2014 until November 2014, Senior Vice President of U.S. Forest Resources from February 2012 to January 2014, and Vice President of U.S. Forest Resources from August 2010 to February 2012. Upon information and belief, defendant Wilson is a citizen of the State of Tennessee.

17.     Defendant Vanden Noort served as Rayonier's Senior Vice President and CFO from July 2007 until April 30, 2014. Defendant Vanden Noort joined Rayonier in 2001 and held various executive positions including Corporate Controller and Chief Accounting Officer ("CAO") prior to becoming CFO. Upon information and belief, defendant Vanden Noort is a citizen of the State of Florida.

18.     Defendant C. David Brown, II ("Brown") served on the Rayonier Board from 2006 until the Separation, in connection with which he resigned from the Board and became a member of the RYAM board of directors. He served on the Audit Committee from 2006 through 2010. Upon information and belief, defendant Brown is a citizen of the State of Florida.

19.     Defendant Mark E. Gaumond ("Gaumond") served on the Rayonier Board from 2010 until the Separation, in connection with which he resigned from the Board and became a member of the RYAM board of directors. He served on the Audit Committee from 2010 through 2013. Upon information and belief, defendant Gaumond is a citizen of the State of California.

20.     Defendant James H. Miller ("Miller") served on the Rayonier Board from 2011 until the Separation in connection with which he resigned from the Board and became a member of the RYAM board of directors. He served on the Audit Committee from 2011 through 2013. Upon information and belief, defendant Miller is a citizen of the State of Florida.

21.     Defendant Thomas I. Morgan ("Morgan") served on the Rayonier Board from 2004 until the Separation, in connection with which he resigned from the Board and became a member of the RYAM board of directors.  He served on the Audit Committee from 2006 through 2007. Upon information and belief, defendant Morgan is a citizen of the State of Florida.

22.     Defendant Ronald Townsend ("Townsend") served on the Rayonier Board from 2001 until the Separation, in connection with which he resigned from the Board and became a member of the RYAM board of directors.  He served on the Audit Committee from 2005 through 2008 and 2010 through 2013.  Upon information and belief, defendant Townsend is a citizen of the State of Florida.

23.     Defendants Boynton, Brown, Gaumond, Miller, Morgan, Townsend, Vanden Noort and Wilson are referred to collectively herein as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

24.     By reason of their positions as officers, directors, and/or fiduciaries of Rayonier and because of their ability to control the business and corporate affairs of Rayonier, the Individual Defendants owed Rayonier and its shareholders fiduciary obligations of good faith, loyalty, and diligence; were and are required to use their utmost ability to control and manage Rayonier in a fair, just, honest, and equitable manner and ensure that Rayonier had complied and was complying with prudent (and with its own) standards; were and are required to ensure that key operational functions were being delegated to trained and qualified employees; and were and are required to ensure that reasonable and adequate compliance and internal controls and effective corporate governance practices and procedures were in place.

25.     The Individual Defendants were also required, in accordance with the Code of Business Conduct and Ethics for Members of the Board of Directors, to "promote ethical behavior and ensure the Company: (a) encourages employees to talk to supervisors, managers, and other

appropriate personnel when in doubt about the best course of action in a particular circumstance; (b) encourages employees to report violations of laws, rules, regulations or the Company's Employee Code of Business Conduct and Ethics to appropriate personnel; and (c) informs employees that the Company will not allow retaliation for reports made in good faith."

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Rayonier, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Rayonier, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.

27.     To discharge their duties, the officers and directors of Rayonier were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Rayonier were required, among other things, to:

> Ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of their business;
>
> Ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;
>
> When put on notice of problems with the Company's business practices and operations, take appropriate action to correct the misconduct and prevent their recurrence; and
>
> Exercise good faith to ensure that the statements made to the public by the Individual Defendants, through the Company, were not materially false and/or misleading.

## ADDITIONAL DUTIES OF THE AUDIT COMMITTEE

28.     Pursuant to the Audit Committee Charter, the Audit Committee is responsible for assisting the Board in its oversight of, among other things: the integrity of the Company's financial statements; the performance of the Company's internal auditor and internal audit function; the Company's compliance with legal and regulatory requirements; and the Company's Enterprise Risk Management ("ERM") Committee[1] program.

29.     To discharge its duties, the Audit Committee had, among others, the following responsibilities:

> [I]ndependent oversight operating under a set of specific procedures to ensure: 1) the integrity of financial reporting and system of internal controls, 2) that material risks are properly identified, assessed and managed, and 3) compliance with legal and regulatory requirements that might have a material effect on the financial statements;
>
> Meeting privately at each regular non-telephonic Committee meeting with management, the internal and independent auditors, and with the Company's Chief Compliance Officer and Ombudsman; allowing direct access between the chief internal audit executive and the Committee;
>
> Reviewing the Company's principal policies for accounting, internal control and financial reporting;
>
> Discussing the audited annual financial statements (Form 10-K) and quarterly financial statements (Form 10-Q) of the Company, with management and the independent auditors before they are filed, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

---

[1] The ERM Committee, which consists of senior executives, is responsible for identifying and assessing the material risks facing the Company and providing periodic reports regarding such risks to the Audit Committee for review and evaluation of mitigation strategies. The Audit Committee then assigns ongoing Board level oversight responsibility for each material risk to either the full Board or the appropriate Board committee. The ERM Committee also completes an annual risk assessment with regard to the Company's overall compensation policies and practices, which is reviewed by the Compensation Committee.

Discussing with management and, as appropriate, other advisors at least annually the development, content, review and issuance of press releases, rating agency and investor presentations and other public disclosures of financial information;

Reviewing required disclosures from management of (a) all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

Reviewing with both the internal and independent auditors the plan, scope, timing, results, budget (internal audit) and coordination of their audit(s);

Discussing the Company's guidelines and policies with respect to risk assessment and risk management, with particular focus on risks related to financial statements and information issued;

Overseeing the Company's ERM Committee, including an annual review of processes for the identification, assessment and management of material risks facing the Company, and assisting the Board in its risk management oversight responsibilities;

Meeting regularly with appropriate representatives of management, including the Chief Risk Officer and the Chief Compliance Officer for purposes of evaluating the adequacy and efficacy of the Company's legal compliance and ethics programs; and

Reporting regularly to the Board with respect to its activities and issuing an annual report, for inclusion in the Company's Proxy Statement, outlining its responsibilities, procedures and compliance with its Charter.

## ADDITIONAL DUTIES OF THE COMPENSATION COMMITTEE

30.     Pursuant to the Compensation and Management Development Committee (hereinafter the "Compensation Committee") Charter, the Compensation Committee is the administrator of the compensation and benefits programs for all employees of the Company with overall authority to establish and interpret the terms of the Company's salary and incentive programs. The goal of these programs is to attract and retain highly qualified individuals with

skills suited to the needs of the Company and to appropriately motivate and reward performance that will lead to enhancement of shareholder value.

31.     To discharge its duties, the Compensation Committee had, among others, the following responsibilities:

Except with respect to the CEO, review and approve compensation arrangements for executive officers and review and approve all agreements (including employment, severance and change in control agreements) with executive officers related to executive compensation, retention or other aspects of their employment relationship with the Company;

Except with respect to the CEO, review and approve the compensation and benefits of all executive officers of the Company, considering, among other factors, individual, business unit and company strategic progress and performance relative to prior years' results, economic and business conditions, annual and long-term goals, comparative and competitive pay and performance levels and the most recent shareholder advisory vote on executive compensation. The Committee shall consult with the independent members of the Board of Directors with respect to compensation levels for executives who are the subject of annual proxy statement disclosure;

Approve, or recommend to the Board of Directors as the circumstances require, such matters as are specifically provided for by Company plans, such as the annual goals and objectives and the total amount of monies available;

Approve, or recommend to the Board of Directors as the circumstances require, and take, such actions as may be required by applicable law, to recover or adjust incentive awards and payments to executive officers if the performance measures upon which such incentive awards or payments were based are restated or otherwise adjusted in a manner that would reduce the size of an award or payment;

Review and recommend to the Board of Directors the election and advancement of officers and establish their applicable salary grade;

Establish and implement an evaluation process for the CEO;

Establish, review and approve annual and long-term corporate and individual performance goals and objectives relevant to CEO compensation, evaluate the performance of the CEO in light of those goals and objectives, and recommend to the independent members of the Board of Directors the compensation level of the CEO based on this evaluation; and

Report on the foregoing to the independent members of the Board of Directors.

## ADDITIONAL DUTIES OF THE CORPORATE GOVERNANCE COMMITTEE

32.     Pursuant to the Nominating and Corporate Governance Committee (hereinafter the "Corporate Governance Committee") Charter, the Corporate Governance Committee is responsible for overseeing processes to evaluate Board and Board committee effectiveness and the performance of management.

33.     To discharge its duties, the Corporate Governance Committee had, among others, the following responsibilities:

To regularly review developments relating to corporate governance issues;

To oversee the Company's Corporate Governance Principles covering directors and management, including review of such Principles and the Company's adherence thereto on at least an annual basis, and to recommend changes as necessary;

To periodically review and recommend to the Board any changes to the other documents and policies in the Company's corporate governance framework, including its Articles of Incorporation and By-laws;

To oversee a process for annual self-evaluation of the effectiveness of the operation of the Board and its committees;

To periodically monitor the orientation and training needs of directors and recommend action to the Board, individual directors and management where appropriate;

To periodically evaluate the quality, sufficiency and currency of information furnished by management to the directors in connection with Board and committee meetings and other activities of the directors; and

The Corporate Governance Committee shall report its actions and recommendations to the Board.

## STANDARD OF ETHICS AND CODE OF CORPORATE CONDUCT

34.     Rayonier's Standard of Ethics and Code of Corporate Conduct (the "Code") requires, among other things:

The Code shall apply fully to members of the Rayonier Board of Directors at all times during which they are acting in such capacity. Any director who becomes aware of a violation or potential violation of the Code should promptly report the situation to the General Counsel;

Employees who know or have grounds for suspecting that any illegal or unethical conduct has occurred or is planned by anyone in connection with Rayonier, are expected to report it.

All managers will adhere to Rayonier corporate and finance policies and procedures. Such policies and procedures are designed to ensure that an adequate system of internal controls exists which provides reasonable assurance of compliance with Company policies and good business practices, and which supports the integrity of the Company's financial statements.

Rayonier funds and assets will be utilized solely for lawful and proper purposes.

Control of Company funds and assets is a legal and fiduciary responsibility, and an ethical obligation, of all employees.

No false or intentionally misleading entries shall be made in any records.

Anyone becoming aware of or suspecting a violation of the Company's finance policies and procedures, or any questionable activity regarding accounting, internal accounting controls or auditing matters, should immediately report the matter, in writing.

Employees will exercise sound judgment guided by the highest personal standards of honesty and integrity in all matters affecting Rayonier. They must not use their positions for personal profit or other personal advantage and should avoid any activity that is contrary to Rayonier's best interest.

Employees who believe that they may be engaged or are about to be engaged in a conflict of interest should promptly disclose the situation, in writing.

Employees have a fiduciary responsibility to protect Company assets and to take prompt and effective corrective measures when attempts are made to misuse or divert assets for personal gain.

All such [SEC] reports, filings and submissions made on behalf of Rayonier will be prepared in order to provide timely, accurate and understandable disclosures in compliance with all applicable securities laws and SEC regulations.

## SUBSTANTIVE ALLEGATIONS

### Background of Rayonier and the Separation

35.    Prior to June 27, 2014, Rayonier had three business segments: (1) Forest Resources;

(2) Real Estate; and (3) Performance Fibers.  The Forest Resources segment owned and leased

timberlands in the Pacific Northwest (primarily in Washington state) and other areas of the United

States and New Zealand and sold standing timber and delivered logs. The Real Estate segment bought and sold medium and large tracts of land primarily in the southeastern United States. The Performance Fibers segment produced cellulose, a natural polymer, which is used as a raw material to manufacture a broad range of consumer-oriented products.

36.    In January 2014, Rayonier announced the Separation, in which its Performance Fibers segment would be spun off into a new company, RYAM. The Separation was ultimately completed on June 27, 2014.

37.    Since the Separation, the Company has described itself as a leading timberland REIT with assets located in some of the most productive timber growing regions in the United States and New Zealand.

38.    In connection with the Separation, defendants Boynton, Brown, Gaumond, Miller, Morgan and Townsend left Rayonier to join RYAM, knowingly leaving behind a company that: (a) for years had artificially propped up its operating earnings and cash available for dividends with harvest levels that its Pacific Northwest timberlands could not sustain; (b) lacked adequate internal controls over financial reporting; (c) had severely depleted the merchantable timber inventory in the Company's Pacific Northwest region; and (d) faced impending reductions in future Pacific Northwest harvest levels that for years to come would have a material adverse effect on Rayonier's prospective earnings and cash available for dividends.

39.    In addition to the compensation he had already received based on financial results that he knew were improperly inflated, defendant Boynton collected a $1.65 million transaction bonus and another $4 million in cash and common stock pursuant to a "special stock agreement" in connection with the Separation.

### The Individual Defendants Misled the Public While Allowing
### Overharvesting of Rayonier's Timber Holdings

40.     For years, the Individual Defendants misled shareholders and the investing public into believing that Rayonier engaged in "sustainable" harvesting practices, meaning the Company harvested timber at levels that could be sustained in perpetuity based on estimates of biological growth and expected productivity resulting from reforestation and silvicultural efforts.

41.     However, as the Company has now admitted in its November 10, 2014 press release, "[f]or roughly a decade, the average rate at which Rayonier harvested timber in the U.S. Pacific Northwest exceeded the rate those timberlands could support on a long-term basis." Specifically, Rayonier's average annual harvest level from 2004 to 2013 in the Pacific Northwest had been approximately 228 million board feet ("MMBF"), when in order to maintain a sustainable yield, the annual harvest level should have been approximately 160 MMBF.

42.     The materially false and misleading statements date back to at least October 26, 2010, when then-CEO Boynton represented on the Company's third quarter earnings conference call that Rayonier was "continu[ing] to defer approximately 30% of [its] sustainable harvest levels" in the Pacific Northwest region. In other words, Rayonier was purportedly not only managing its Pacific Northwest timberlands on a sustainable basis, but was enhancing asset value and earnings prospects by deferring harvests of merchantable timber inventory to future periods. According to defendant Boynton, this conservative harvesting "preserve[d] value" because timber that is not harvested continues to grow on the land and becomes more valuable as it ages.

43.     In fact, just the opposite was true. Rayonier was harvesting more timber than its Pacific Northwest timberlands could sustain, not less; artificially propping up current period earnings at the expense of future period earnings; depleting merchantable timber inventory levels, not stockpiling inventory; and wasting asset value, not maximizing asset value by harvesting

younger and younger trees to maintain inappropriate harvest levels . . . "cutting the wrong type of timber at the wrong time."

44.     The Individual Defendants made similar statements over the next several years. On Rayonier's fourth quarter and 2010 year-end conference call on January 25, 2011, defendant Boynton directed investors to an accompanying PowerPoint presentation that showed the Company's historical harvesting in the State of Washington for all of 2008, 2009 and 2010, and again represented that in both 2009 and 2010 Rayonier harvested below the sustainable rate. Defendant Boynton stated that even though Rayonier planned to "increase [its] harvest level 10% to 15% for [2011]," the Company would "still [be harvesting] below [its] sustainable harvest level."

45.     On February 23, 2011, Rayonier filed its Form 10-K for 2010, signed by defendants Vanden Noort, Brown, Gaumond, and Towsend. In the Form 10-K, these defendants claimed that the Company's "rotation ages range from 35 to 50 years in Washington." Defendants Boynton, Vanden Noort, Brown, Gaumond, Miller, Morgan, and Townsend reiterated this false statement in the Company's Form 10-K for 2011, filed on February 28, 2012, and the Form 10-K for 2012, filed on February 26, 2013, and the Form 10-K for 2013, filed on February 28, 2014.

46.     Defendants Boynton, Vanden Noort, Brown, Gaumond, Miller, Morgan, and Townsend falsely stated in the Company's 2011, 2012 and 2013 Forms 10-K that:

> We manage our U.S. timberlands in accordance with the requirements of the Sustainable Forestry Initiative® ("SFI") program, a comprehensive system of environmental principles, objectives and performance measures that combines the perpetual growing and harvesting of trees with the protection of wildlife, plants, soil and water quality. Through application of our site-specific silvicultural expertise and financial discipline, we manage timber in a way that optimizes site preparation, tree species selection, competition control, fertilization, timing of thinning and final harvest. . All these activities are designed to maximize value while complying with SFI requirements. (Emphasis added)

47.     On April 26, 2011, Rayonier held a conference call to discuss its financial results. Again, defendants Boynton, Vanden Noort and Wilson claimed that the Company could substantially increase its harvesting and still be at a sustainable rate. In particular, in response to a question from an analyst about what was Rayonier's "sustainable harvest potential" in Washington state, defendant Wilson responded that "[w]e are currently at the 75% level of where we can ramp up to."

48.     In mid-2011, the Company revamped its website, adding further statements that highlighted Rayonier's purportedly sustainable harvesting practices.   In May 2011, a "Sustainability" webpage was added to the website that touted Rayonier's "commitment to sustainable forestry," stating that "Rayonier is committed to ensuring that our resources are as abundant in the future as they are today" as "[s]ustainability benefits our environment and our business" and provides "long-term value for our shareholders."

49.     At the Board's July 22, 2011 meeting Boynton reviewed with the Board (then comprised of defendants Brown, Gaumond, Morgan, and Townsend among others) the process for development of the 2011 LRP and discussed key performance drivers over the LRP period. Wilson was present at the July 22, 2011 Board meeting and presented the current and projected timberland portfolio over the LRP period, acquisitions and land sales, as well as key drivers of the Forest Resource business. Wilson also presented historic and projected pricing and harvest levels.

50.     Defendant Wilson highlighted the Company's claimed deferral of timber volume during a September 22, 2011 investor day presentation as allowing Rayonier to increase its production.  Thus, when defendant Wilson stated that the Company would accelerate its harvest of deferred volume in the Pacific Northwest in order to meet demand in Asia to 1.9 million tons

(which was predicted to yield additional adjusted EBITDA of $18 million), there was no indication of concern for long-term sustainability.

51.    It was widely known within the Company that the above statements concerning Rayonier's sustainable harvesting were false. An August 11, 2011 draft presentation titled "Pacific Harvest Schedule Preliminary Results" showed ████████████████████████████

████████████████████

52.    An August 26, 2011 email from George Brulotte, the Resource Development Manager for the Company's Pacific Region, detailed ███████████████████████

████████████████████████████████████████████

██████████████████████████████████████

53.    Internal non-public presentations from October 2011, which were emailed to various recipients including defendant Wilson, detailed ████████████████████

███████████████████████████

54.    An October 13, 2011 email from Eric Fanelli, Director of Land Support Services to Michael Oppenheimer in Forest Resources indicated that ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

55.    Indeed, defendant Wilson ultimately determined to keep harvesting at unsustainable levels, as indicated in an email from Mr. Brulotte dated November 4, 2011:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



56.  Defendant Wilson later admitted in an April 5, 2012 email

57.  Additional documents and correspondence produced by Rayonier evidence defendant Wilson and others "hiding" and "masking" the Company's overharvesting, and its effects.  For example, a March 2012 LRP "Implementation Plan" for the Pacific Resource Unit stated that

58.  In addition, a May 2012 email from Mr. Brulotte stated that

59.  The Company's 2012 LRP confirmed that harvest levels would

60.  Under the 2012 LRP, the Company

61.    Senior management, including defendant Boynton, were well aware of the predicted drop off in harvest levels.  On May 29, 2012, defendant Boynton stated to defendant Wilson ███████████████████████████████████████████████████████████████

62.    The Company's 2012 LRP was presented to the Board (then comprised of defendants Boynton, Brown, Gaumond, Miller, Morgan, and Townsend) at a July 20, 2012 Board meeting.  The Board was shown an LRP presentation by Helen Rowan, Rayonier's Vice President, Long Range Planning and Analysis.  Defendant Wilson presented 2012 LRP actions related to the Company's Forest Resources business including key business drivers, risks and opportunities and updated harvest volumes for each region.

63.    In addition, according to minutes of meetings of the Company's Disclosure Committee, which was comprised of senior executives, the Disclosure Committee received updates on the Company's LRP from defendant Vanden Noort.  *See, e.g.*, Rayonier Disclosure Committee Minutes of Meeting – February 3, 2012.

64.    Despite this widespread knowledge, defendants Boynton, Brown, Gaumond, Miller, Morgan, Townsend, Vanden Noort and Wilson continued to misrepresent to investors that the Company was harvesting timber at sustainable levels.  On September 5, 2012, defendant Boynton presented on behalf of Rayonier at the Bank of America/Merrill Lynch Industrials & Material Conference in Boston, Massachusetts.  During that presentation, Boynton explained that deferring timber harvests helps the Company because "unlike most natural resources, it continues to grow," so that "if you decide you're not going to harvest it at that point in time," then "it grows naturally, in the forest, 4% to 6% to 7% a year,[] just by keeping it there and waiting for the right time to move it out to market."  Further, defendant Boynton used PowerPoint slides to accompany

his presentation, one of which stated that the Company had "deferred volume in the Pacific Northwest."

65.     Less than a week later, on September 11, 2012, Rayonier presented to investors at the RBC Capital Market Global Industrials Conference ("RBC Conference") in Las Vegas.  During the presentation, defendant Vanden Noort again highlighted that, in the Pacific Northwest, "[w]e have a sustainable rate around 2 million tons [per year], and we [harvested] below 1.5 million [last year]."   He told investors that "most of our deferred harvest has been out in the state of Washington" so there was "room there to ramp that harvest up out West," which contrasted with the Southeast region, where harvesting was "pretty much at a sustainable level."

66.     John Bryant, a Rayonier Forest Planning and Inventory manager forwarded to defendant Wilson the following chart setting ███████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████



67.    At the July 18, 2013 Board meeting, defendant Wilson again presented the LRP for the Forest Resource business segment to the Board (then comprised of defendants Boynton, Brown, Gaumond, Miller, Morgan, and Townsend among others). In this particular instance, Wilson presented a version of the LRP for Rayonier that included the Forest Resources and Real Estate businesses only under the assumption and that the Performance Fibers business had been spun-off (code named "Riesling") for the Board's consideration of whether to approve the planned Separation.

68.    At the same Board meeting, defendant Wilson also discussed historic and projected pricing and harvest levels and financial projections for the Forest Resource segment. Accordingly, defendants Boynton, Brown, Gaumond, Miller, Morgan, Townsend and Vanden Noort, all of whom attended the July 18, 2013 Board meeting, were also aware of the impending drop in harvest levels due to the Company's unsustainable harvesting practices.

69.    Rayonier's "Sustainability Report 2013" emphasized that "[s]ustainability [is] the Rayonier way" and that Rayonier "[s]ustainably manages 2.6 million acres of timberland in the U.S. and New Zealand." A special "message from Paul Boynton" accompanying the Sustainability Report explained that the Company "deliver[ed] value to [its] shareholders" by harvesting at a sustainable rate, noting that "[w]ith harvest cycles that can stretch as long as 60 years, sustainability has always been a critical part of the planning horizon for forest investment."

70.    In June 2014, shortly before the Separation, management continued to hide Rayonier's overharvesting and depleted merchantable timber inventory. Defendant Wilson stated that ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

71.     On July 18, 2014, the first Board meeting after the Separation, defendant Wilson reported to the members of the Board on the Forest Resources business. Wilson reviewed a variance analysis of current volume and price forecasts versus budget and bridged forecasted operating earnings to budget. Notably, the July 18, 2014 Board meeting was the last Rayonier Board meeting Wilson would attend.

**The Inclusion of Non-Harvestable Timber in Merchantable Timber Inventory Calculations**

72.     On February 28, 2014, Boynton, Brown, Gaumond, Miller, Morgan, Townsend and Vanden Noort caused Rayonier to file the 2013 10-K. The 2013 10-K reported that as of December 31, 2013, Rayonier's Forest Resources segment held 88,544,000 short green tons in merchantable timber inventory. The 2013 10-K explained that merchantable timber inventory is an estimate of timber volume based on the earliest economically harvestable age and is used in the Company's annual and quarterly calculation of depletion expense in cost of goods sold. As in previous disclosures, the 2013 10-K expressly stated that "Timber located in restricted or environmentally sensitive areas and economically inaccessible swamplands is not included in the merchantable inventory [reported in the Company's financial statements]."

73.     That statement was materially false and misleading. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

74.     Those high-level discussions apparently took place, and in June 2013 it was decided that "100% of volume formerly excluded as being in SFI restricted zones or because it is in stands typed as being inaccessible will be included in the [timber inventory] report this year."

75.     On November 10, 2014, the Company disclosed that, despite the statements to the contrary in the 2013 10-K and other disclosures, it had been including in its merchantable timber inventory estimates timber that was located in specially designated restricted, environmentally sensitive and/or economically inaccessible areas.  The Company admitted that the inclusion of such timber "was incorrect, inconsistent with its definition of merchantable timber inventory, and a significant change from prior years."  The inclusion of non-merchantable timber in merchantable timber inventory caused the Company to understate its depletion expense in cost of goods and therefore materially overstate its income from continuing operations for the first and second quarters of 2014.

76.     This significant accounting "error" was also purportedly discovered after the June 27, 2014 Separation in connection with management's "review of [Rayonier's] operations and business strategies."  As a result of the internal review, the Audit Committee concluded on November 7, 2014, that the Company's financial statements for the first two quarters of 2014 should no longer be relied upon and needed to be restated.

77.     As the restated financial statements show, the impact of the inclusion of the improper timber was significant.  As demonstrated by the original and restated pro forma financial statements issued by Rayonier following the Separation, income from continuing operations was

25

overstated by $1,949,000, or 18.8%, for the first quarter of 2014.  Income from continuing operations was overstated by $2,032,000, or 33.6%, for the second quarter of 2014.

78.     It was also determined that volumes of timber that should have been excluded from merchantable timber inventory in 2012 and 2013 had been improperly included.  In the third quarter of 2014, Rayonier recorded an additional depletion expense of $2.6 million as an out-of-period adjustment for such errors.

79.     Also as part of the restatement, Rayonier's merchantable timber inventory as of December 31, 2013 was reduced to 80,127,000 short green tons, 10% less than was originally reported.

### THE TRUTH IS SLOWLY REVEALED

80.     According to the Company's November 10, 2014 Form 8-K, following the Separation, management, led by new CEO Nunes, "conducted a review of [Rayonier's] operations and business strategies and identified issues related to its historical timber harvest levels, its estimate of merchantable timber inventory and the effect of such estimate on its calculation of depletion expense."  Thereafter, the Board directed management to commence an internal review into these matters.  Management conducted the review "with the assistance of independent counsel, forensic accountants and financial advisers."

81.     The internal review that was disclosed on November 10, 2014 revealed the Individual Defendants' actual practice of harvesting the Company's timberlands at unsustainable rates. According to Rayonier's Form 8-K filed on November 10, 2014, the Company's average annual harvest level from 2004 to 2013 in the Pacific Northwest had been approximately 228 MMBF, or 1.9 million tons, when it should have been 160 MMBF, or 1.3 million tons.  Thus, the Company had been overharvesting its timber holdings on average by a staggering 42.5%, in stark

contrast to the Individual Defendants' statements that it had been under-harvesting its timber by 30%.

82.    As a result of this overharvesting, Rayonier's total timber inventory in the Pacific Northwest had actually declined each year since 2008, with a precipitous drop of approximately 17% between 2012 and 2013.

83.    Also in November 2014, the Company finally disclosed the true ages and volumes of trees in its Pacific Northwest timberlands, which were closely monitored and known internally at Rayonier for years.  The newly disclosed data revealed that over one-third of the Company's timber acreage was comprised of trees less than ten years old – decades away from being merchantable – as a result of the Company's overharvesting.

84.    In other words, the Company's unsustainable practices involved cutting down younger and younger trees well before they could generate maximum value.  Harvesting increasingly younger trees to maintain current harvest volumes depleted the pipeline of maturing trees, leaving a void of merchantable timber available for future harvests.

85.    To reverse the effects of years of overharvesting and begin to manage its timberlands sustainably, in November 2014 the Company disclosed that it would have to reduce its Pacific Northwest harvest level by approximately 45% to 125 MMBF, or 1.0 million tons, annually by 2017 and maintain that level for five to ten years "to allow for inventory replenishment and age class smoothing."

### THE SECURITIES AND EXCHANGE COMMISSION INVESTIGATION

86.    At the Company's December 9, 2014 ERM Committee meeting, Rayonier's Associate General Counsel, Christopher Van Tuyl, reported ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

## THE INDIVIDUAL DEFENDANTS FAILED TO ACT DESPITE KNOWING ABOUT THE COMPANY'S INADEQUATE INTERNAL CONTROLS

87.     Although certain Individual Defendants repeatedly caused the Company to state in its financial statements that its internal controls over financial reporting were effective, in connection with the restatement the Company has admitted that it did not maintain effective control over the accounting for depletion expense, as of at least December 31, 2013 through September 30, 2014:

> Specifically, Rayonier's controls related to the preparation and review of the annual depletion calculation which commenced in 2013 were not adequate to ensure that the changes in depletion rate estimates used to recognize depletion expense in 2014 were in accordance with accounting principles generally accepted in the United States of America. Further, these controls relied, in part, on electronic data from information technology systems with ineffective user access and program change management general controls.

November 10, 2014 Form 8-K.

88.     The deficient internal controls were well-known by defendants Boynton, Brown, Gaumond, Miller, Morgan, Townsend and Vanden Noort in early 2014, when Ernst & Young

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

89.



## CERTAIN INDIVIDUAL DEFENDANTS' UNDESERVED COMPENSATION

90.     Rayonier's executive officers, particularly defendants Boynton, Vanden Noort and Wilson, were over-compensated during the time that they knew that the Company was: artificially propping up reported net earnings by harvesting its timber at unsustainable levels, overstating net earnings and understating cost of sales by improperly including timber located in restricted or environmentally sensitive areas and economically inaccessible swamplands in publicly reported merchantable timber inventory figures; and boosting Total Shareholder Return ("TSR") by artificially inflating the market price of Rayonier common stock.

91.     Defendants Boynton, Vanden Noort and Wilson received base salary, cash bonus and long-term incentive compensation (stock options and performance shares) for total compensation in the amounts set forth in the following chart:

| Total Compensation Paid to Rayonier Executives While They Were Hiding Unsustainable Harvesting Practices | | | |
|---|---|---|---|
| Officer | 2011 | 2012 | 2013 | 2014 |
| Boynton | $3,531,200 | $5,703,372 | $5,664,557 | $3,580,777 |
| Vanden Noort | $2,350,010 | $2,235,183 | $2,009,649 | $1,164,299 |
| Wilson | $783,507 | $1,122,104 | $1,167,034 | $1,666,785 |

92.     The base salary component is fixed and intended to compensate executives based on their experience, expertise and job responsibilities, for work performed during the fiscal year.

93.     Each year the Board's Compensation Committee established a target bonus (expressed as a percentage of annual base salary) for each named executive officer. The Bonus Plan allowed for bonus payments of up to 200% of target amounts. Bonus awards were intended to be dependent on achievements during the year, 80% weighted to financial performance and 20% to strategic objectives. The 80% financial performance component was based on reported net income and cash available for dividends ("CAD") measured against budget levels weighted equally.

94.     The payout percentages calculated based on performance against the financial metrics and strategic objectives are added together to create a single measurement of performance referred to as the Corporate Performance Factor ("CPF"). The Compensation Committee had discretion to adjust the CPF after analysis of all unusual, non-recurring and non-budgeted items impacting the CPF calculation.

95.     For example, at the December 2013 Compensation Committee meeting, ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ In January 2014, the Company reported slightly higher 2013 results, increasing the CPF to 145.2% of target awards, or $4.55 million for named executive officers. At its February 27, 2014 meeting, the Compensation Committee

████████████████████████████████████████████████████████████████

███████████

96.     ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████  Overharvesting inflated current period net earnings

and CAD.

97.    The bonuses paid to defendants Boynton, Vanden Noort and Wilson comprised a

significant portion of their overall compensation during 2011 through 2013:

| Cash Bonuses Paid to Rayonier Executives While They Were Hiding Unsustainable Harvesting Practices | | | |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| Boynton | $840,000 | $1,075,000 | $1,200,000 |
| Vanden Noort | $424,678 | $365,000 | $396,505 |
| Wilson | $240,000 | $210,000 | $275,000 |

98.    Notably, defendant Boynton, who was well aware of the overharvesting yet made

numerous public statements to the contrary, approved the bonuses paid to the Company's other

executives, including defendants Vanden Noort and Wilson.

99.    In addition, defendant Boynton received a significant "transaction bonus" of $1.65

million for completing the Separation.  Boynton also received a lucrative position at the post-

Separation company and $4 million worth of common stock of the spun-off company.  Boynton's

retention of these amounts is unjust in light of his breach of fiduciary duties that made the spin-off

possible.

100.    Long-term incentive compensation targets (typically allocated 80% in performance

shares and 20% in stock options), were also determined and approved annually for each named

executive. Stock options were purportedly used to reward superior performance.  Performance

shares purportedly focused executives on the long-term creation of shareholder value, provided

retention incentive and maintained competitive levels of total compensation.

101.   Payout of long-term incentive compensation was based on a TSR calculation, the 20 day trading day average closing share price at the start and end of a 3-year period to measure hypothetical return on an investment in Rayonier stock versus the hypothetical return on an investment in stock of approximately 15 predetermined peer companies, assuming reinvestment of dividends in all cases:

$$TSR = \frac{\text{Average Stock Price at End } - \text{Average Stock Price at Start}}{\text{Average Stock Price at Start}}$$

102.   Based on Rayonier's performance relative to the performance of its peer companies over the performance period, the long term incentive payout could range from 0% to 200% of target based on the following schedule:

| Relative TSR Performance | Performance Shares Earned |
|---|---|
| 80th percentile and above | 200% |
| 60th percentile | 100% |
| 30th percentile | 30% |
| Below 30th percentile | 0% |

103.   For 2011 through 2014, Performance Shares and Stock Options were awarded based on the artificially inflated market price of Rayonier stock as follows:

| Performance Share Awards ("PS") and Stock Option Awards ("O") Paid to Rayonier Executives While They Were Hiding Unsustainable Harvesting Practices | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2011 | | 2012 | | 2013 | | 2014 | |
| | PS | O | PS | O | PS | O | PS | O |
| Boynton | $1,281,082 | $230,206 | $2,537,132 | $500,189 | $2,689,839 | $600,040 | $2,473,974 | $650,401 |
| Vanden Noort | $961,585 | $172,543 | $875,767 | $172,655 | $896,613 | $200,060 | $761,223 | $200,180 |
| Wilson | $222,786 | $39,990 | $507,201 | $100,251 | $448,307 | $99,960 | $1,115,742 | $160,090 |

104.   During October 26, 2010 through November 10, 2014, the market price of Rayonier stock was artificially inflated due to the Company's issuance of material false and misleading statements. Further, Rayonier's financial results for 2011 through November 10, 2014 were artificially propped up with unsustainable overharvesting while its peers' financial results were not. This caused calculations used to award incentive compensation to overstate Rayonier's TSR

relative to its peers. Thus, Boynton, Vanden Noort and Wilson were awarded incentive compensation to which they were not entitled.

105. Following the Company's November 10, 2014 admissions of overharvesting and related misconduct, the Company's share price plummeted from $33.90 as of November 7, 2014 to close on November 10, 2014 at $28.82, a reduction of $5.08 or 15%. As of the December 11, 2014 Compensation Committee meeting, ███████████████████████████████

███████████████████  Consequently, there would be no payout of performance shares maturing January 1, 2015.

106. Notably, by January 2015, defendants Boynton, Vanden Noort and Wilson had each resigned from their executive positions with the Company.

107. On March 13, 2017, Rayonier announced that the Company reached an agreement in principle to settle the securities class action litigation pending against it in the United States District Court for the Middle District of Florida, *In re Rayonier Inc. Securities Litigation*, Case No. 3:14-cv-01395-TJC-JBT (the "Securities Litigation"). The Securities Litigation complaint alleged that the defendants therein, including Boynton, Vanden Noort and Wilson, caused the market price of Rayonier common stock to be artificially inflated from October 26, 2010 through November 7, 2014, inclusive. According to Rayonier, the terms agreed upon by the parties contemplate a settlement payment to the class of $73 million.

### The Individual Defendants' Breaches of Fiduciary Duties and Unjust Enrichment Have Harmed Rayonier

108. The Company has suffered significant and continuing harm as a result of the Individual Defendants' breaches of fiduciary duties. The Company had to hire independent counsel, forensic accountants and financial advisors in connection with the internal review, and

also had to restate its financial statements. The Company has disclosed that it spent at least $3.4 million on the restatement and internal review.

109.    In addition, Rayonier was forced to respond to an SEC investigation and is in the process of defending or settling the Securities Action. In connection with the SEC investigation, which "ar[o]se from [the Company's] announcement on November 10, 2014 regarding the results of [its] internal review and the restatement...," the Company received a subpoena "seeking documents related to the Company's amended reports filed with the SEC on November 10, 2014."

110.    Through September 30, 2016, the Company has spent at least $5.7 million on costs related to shareholder litigation and the SEC investigation, but these costs will likely be significantly higher, particularly because the federal district court denied the defendants' motion to dismiss the Securities Action and discovery had commenced prior to the settlement.

111.    Furthermore, in connection with the announcement of the restatement and changes in harvesting practices, the Company also announced that defendant Wilson had resigned from her position effective as of November 7, 2014. Despite being in charge of the business segment that materially overstated its income and overharvested its timber and purposefully concealed the overharvesting, defendant Wilson received substantial compensation following her resignation.

112.    Specifically, defendant Wilson continued to receive her base salary through January 7, 2015 (the "On Call Period") during which she was to provide "transitional support." Defendant Wilson was also entitled to any payout under the Company's outstanding performance share award programs and her restricted stock awards, continued vesting of her outstanding stock option awards through the end of the On Call Period, and continued to receive insurance benefits. Defendant Wilson had until January 7, 2016 to exercise any vested and outstanding stock options.

113.     According to the Company's proxy statement filed on March 30, 2015, defendant Wilson received substantially greater compensation in 2014 than in previous years, and specifically a 42.8% increase over 2013.

114.     The continued compensation of defendant Wilson was improper and constituted additional damages to Rayonier and unjust enrichment of defendant Wilson.

115.     The Company has been forced to drastically reduce its annual harvest volumes in the Pacific Northwest to compensate for the years of over-harvesting. This reduction in timber harvesting has caused a corresponding reduction in revenues, which will continue for at least the next five to ten years. The Company also has a diminished supply of mature trees available for marketability, and, as noted above, timber becomes more valuable as it ages.

116.     Finally, as a result of, among other things, overharvesting and depleting the Company of valuable merchantable timber, defendants Boynton, Vanden Noort and Wilson were overpaid for their disloyalty.

## DERIVATIVE AND DEMAND ALLEGATIONS

117.     Plaintiff brings this complaint derivatively in the right and for the benefit of Rayonier to redress injuries suffered by Rayonier as a direct result of the violations of fiduciary and other common law duties by the Individual Defendants and the unjust enrichment of defendants Boynton, Vanden Noort and Wilson.

118.     Plaintiff is a stockholder of Rayonier, was a stockholder of Rayonier at the time of the wrongdoing alleged herein, and has been a stockholder of Rayonier continuously since that time.

119.     Plaintiff will adequately and fairly represent the interests of Rayonier and its public shareholders in enforcing and prosecuting their rights.

120. On February 13, 2015 Plaintiff served a pre-suit litigation demand (the "Demand") on the Board to take action against the Individual Defendants and to recover damages to the Company. Attached hereto as Exhibit A is a true and correct copy of the Demand.

121. North Carolina General Statute Section 55-7-42 permits a derivative proceeding to commence 90 days after the date demand was made. After the Demand was made, Plaintiff and Rayonier entered into a series of tolling agreements and amendments thereto which tolled the 90-day period. Such agreements have since expired.

## COUNT I

### Against All Individual Defendants for Breach of Fiduciary Duties

122. Plaintiff incorporates by reference the allegations set forth in 1 through 120 as if fully set forth herein.

123. As alleged herein, each of the Individual Defendants had statutory and common law fiduciary duties to, among other things, exercise good faith to ensure that the Company met its obligations and fulfilled its fiduciary duties, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

124. In violation of their statutory or common law fiduciary duties, defendants Boynton, Vanden Noort and Wilson engaged in a scheme to improperly and materially inflate the Company's financial results by overharvesting its timberlands and including non-merchantable timber in its merchantable timber inventory, and the non-management members of the Board, including defendants Brown, Gaumond, Miller, Morgan, Townsend, ignored the obvious and pervasive problems with Rayonier's internal control practices and/or procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

125. Defendant Wilson was improperly rewarded for spearheading the scheme.

126.     Each of the Individual Defendants owed and/or owe Rayonier statutory and common law fiduciary obligations. By reason of their fiduciary relationships, each of the Individual Defendants specifically owed and owe Rayonier the highest obligations of good faith, fair dealing, loyalty, and due care.

127.     Each of the Individual Defendants violated and breached their statutory and common law fiduciary duties of care, loyalty, oversight, good faith, and supervision.

128.     As a direct and proximate result of each of the Individual Defendants' failure to perform their statutory and common law fiduciary obligations, Rayonier has sustained significant financial, regulatory, and reputational damage.

129.     As a result of the misconduct alleged herein, each of the Individual Defendants is liable to the Company.

130.     The Individual Defendants' failures were not an exercise of reasonable business judgment.

131.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT II

**Against Defendants Boynton, Vanden Noort and Wilson for Unjust Enrichment**

132.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 131, as though fully set forth herein.

133.     By their wrongful acts and omissions, defendants Boynton, Vanden Noort and Wilson were unjustly enriched at the expense and to the detriment of Rayonier.

134.     An inequity exists due to such defendants' unjust enrichment at Rayonier's expense and detriment.

135. Plaintiff, as a shareholder and representative of Rayonier, seeks restitution from defendants Boynton, Vanden Noort and Wilson, and each of them, and seek an Order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A. Awarding against all of the Individual Defendants and in favor of Rayonier the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of statutory and common law fiduciary duties;

B. Directing Rayonier to take all necessary actions to reform and improve its corporate governance and internal control practices and procedures to comply with applicable laws and best practices and to protect the Company and its shareholders from a recurrence of the damaging events described herein, including, but not limited to, amending Rayonier's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C. Awarding Rayonier restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct;

D. Awarding to Plaintiffs their reasonable attorneys' fees, costs and disbursements in the action, including reasonable accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Respectfully submitted this 12th day of October 2017.

**EGGNATZ PASCUCCI, P.A.**

*/s/ Joshua H. Eggnatz*
Joshua H. Eggnatz
5400 S. University Drive, Suite 417
Davie, Florida 33328
Tel: (954) 889-3359

*Local Counsel for Plaintiff*


**THE SHUMAN LAW FIRM**
Kip B. Shuman (Trial Counsel)
Rusty Glenn
600 17th Street, Suite 2800 South Denver,
CO 80202
Tel. 303-861-3003
(*Pro Hac Vice* to be filed)

*Trial Counsel for Dave Molloy*


**STULL, STULL & BRODY**
Patrick Slyne (Trial Counsel)
Mark Levine
Michael Klein
6 East 45th Street, 5th Floor
New York, NY 10017
Tel. 212-687-7230
(*Pro Hac Vice* to be filed)


**KESSLER TOPAZ
    MELTZER & CHECK, LLP**
Eric L. Zagar
Kristen L. Ross
280 King of Prussia Road
Radnor, PA 19087
Tel. 610-822-2209
(*Pro Hac Vice* to be filed)

**THE WEISER LAW FIRM, P.C.**
Robert Weiser
Brett Stecker
James Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Tel. 610-225-2677
(*Pro Hac Vice* to be filed)

**ROBBINS ARROYO LLP**
Gregory E. Del Gaizo
Craig W. Smith
600 B Street, Suite 1900
San Diego, CA 92101
Tel. 619-525-3990
(*Pro Hac Vice* to be filed)

*Additional Trial Counsel for Plaintiff*