# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| DAVE MOLLOY, derivatively on behalf of RAYONIER INC., | |
| Plaintiff, | Civil Action No. |
| v. | 3:17-cv-01157-TJC-MCR |
| PAUL G. BOYNTON, NANCY LYNN WILSON, HANS VANDEN NOORT, C. DAVID BROWN, II, MARK E. GAUMOND, JAMES H. MILLER, THOMAS I. MORGAN, and RONALD TOWNSEND, | |
| Defendants, | |
| and | |
| RAYONIER INC., a North Carolina Corporation, | |
| Nominal Defendant. | |

**PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND APPROVAL OF THE AGREED-UPON ATTORNEYS' FEES AND EXPENSES AND MEMORANDUM OF LEGAL AUTHORITY IN SUPPORT**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................1

II.   BACKGROUND OF THE ACTION AND SETTLEMENT .............................5

    A.    Stockholders Issue Litigation Demands on the Board ............................5

    B.    Certain of the Settling Parties Attend the First Mediation......................5

    C.    Stockholders' Counsel Receive and Review 1.5 Million Pages of Documents ......................................................................................5

    D.    Certain of the Settling Parties Attend the Second Mediation and Continue to Engage in Settlement Discussions Thereafter .......................................6

    E.    Plaintiff Files the Action .......................................................................7

    F.    The Settling Parties Continue Arm's-Length Settlement Discussions and Reach an Agreement-in-Principle..........................................................7

    G.    The Stockholders, Rayonier and Its Insurers Mediate and Agree to an Appropriate Amount of Attorneys' Fees and Expenses ...........................7

    H.    Preliminary Approval and Notice to Current Rayonier Stockholders ...................8

III.  THE SETTLEMENT CONFERS SUBSTANTIAL BENEFITS ON RAYONIER...........9

    A.    Comprehensive Written Inventory Policy ...............................................9

    B.    Disclosure Committee.........................................................................10

    C.    Audit Committee................................................................................10

    D.    Whistleblower Hotline .......................................................................11

    E.    Senior Manager of Internal Controls ...................................................11

    F.    Enhanced Review of Inventory, Depletion, and Harvest Schedule .....................11

    G.    Changes to Compliance Procedures.....................................................12

    H.    Changes to Accounting and Audit Procedures ......................................12

IV.   THE SETTLEMENT SHOULD BE FINALLY APPROVED .........................12

    A.    Standards for Judicial Approval of a Derivative Settlement ..................12

B.      The Settlement Was Not the Result of Fraud or Collusion ....................................13

C.      The Stage of the Proceedings...................................................................................14

D.      The Likelihood of Success at Trial .........................................................................15

E.      The Range of Possible Recovery .............................................................................16

F.      The Complexity, Expense, and Likely Duration of This Litigation ......................17

G.      The Opinion of Rayonier Stockholders ..................................................................18

V.     THE AGREED-UPON FEES SHOULD BE APPROVED..............................................18

A.      Applicable Legal Standards .....................................................................................19

       1.      The Novelty and Difficulty of the Questions and Skill Necessary............19

       2.      The Preclusion of Other Employment by Stockholders' Counsel..............20

       3.      Whether the Fee Is Fixed or Contingent ....................................................21

       4.      The Amount Involved and Results Achieved ............................................21

       5.      The Experience, Reputation, and Requisite Skill of the Attorneys ...........21

       6.      Awards in Similar Cases .............................................................................22

B.      The Incentive Awards Requested by Stockholders Are Reasonable ....................24

VI.    CONCLUSION...............................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Alphatec Holdings, Inc. Derivative S'holder Litig.*,
    No. 37-2010-00058586, slip op. (Cal. Super. Ct. Aug. 18, 2014) ..........................................23

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997) ...........................................................................................................13

*In re Apollo Grp., Inc. Sec. Litig.*,
    2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL
    5927988 (9th Cir. June 23, 2010) .........................................................................................18

*Behrens v. Wometco Enters., Inc.*,
    118 F.R.D. 534 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990) ...................................23

*Bennett v. Behring Corp.*,
    737 F.2d 982 (11th Cir. 1984) .................................................................................13, 14, 18

*Bivins v. Wrap It Up, Inc.*,
    548 F.3d 1348 (11th Cir. 2008) ..........................................................................................19, 21

*In re Cendant Corp. Action Litig.*,
    232 F. Supp. 2d 327 (D.N.J. 2007) .......................................................................................24

*Clark v. Lomas & Nettleton Fin. Corp.*,
    79 F.R.D. 641 (N.D. Tex. 1978), *vacated on other grounds by*, 625 F.2d 49
    (5th Cir. 1980)....................................................................................................................19

*Cohn v. Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005)...................................................................................24

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) .................................................................................12, 13, 14

*Cty. of York Emps. Ret. Plan v. Jung*,
    No. 651304/2010, slip op. (NY Sup. Ct. Aug. 3, 2016) ........................................................22

*Figueroa v. Sharper Image Corp.*,
    517 F. Supp. 2d 1292 (S.D. Fla. 2007) ................................................................................13

*Fla. Trailer & Equip. Co. v. Deal*,
    284 F.2d 567 (5th Cir. 1960) ...............................................................................................12

*Gregg v. U.S. Indus., Inc.*,
  887 F.2d 1462 (11th Cir. 1989) ...........................................................................18

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983).............................................................................................22

*Ingram v. Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001)........................................................................14

*Johansen v. Combustion Eng'g, Inc.*,
  170 F.3d 1320 (11th Cir. 1999) ...........................................................................18

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by*
  *Blanchard v. Bergeron*, 489 U.S. 87, 92 (1989) .........................................19, 21, 22

*Kloss v. Kerker*,
  No. 502010CA018597XXXXMB, slip op. (Fla. Cir. Ct. May 27, 2011)................................22

*Lizondro-Garcia v. Kefi LLC*,
  2014 WL 4996248 (S.D.N.Y. Oct. 7, 2014) ....................................................24

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ...........................................................12, 13, 16, 21

*Mashburn v. Nat'l Healthcare, Inc.*,
  684 F. Supp. 679 (M.D. Ala. 1993) ...................................................................24

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ...........................................................................14

*Miller v. Republic Nat'l Life Ins. Co.*,
  559 F.2d 426 (5th Cir. 1977) ...........................................................................13

*In re Pac. Enters. Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995) ...........................................................................16

*Pinto v. Princess Cruise Lines, Ltd.*,
  513 F. Supp. 2d 1334 (S.D. Fl. 2007) ................................................................23

*In re Presidential Life Secs.*,
  857 F. Supp. 331 (S.D.N.Y. 1994) ....................................................................24

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968)......................................................................................15, 17

*Ret. Sys. v. Kelly*,
  No. 08-8692, slip op. (Tex. Civ. Ct. Dallas Cty. Dec. 7, 2009)............................22

*Rosenfeld v. Campenelli*,
No. 13-135711, slip op. (Mich. Cir. Ct. July 7, 2015) ............................................................23

*Ross v. Bernhard*,
396 U.S. 531 (1970) ......................................................................................................................19

*In re Smith*,
926 F.2d 1027 (11th Cir. 1991) ..................................................................................................12

*Surowitz v. Hilton Hotels Corp.*,
383 U.S. 363 (1966) ......................................................................................................................21

*United States v. Alabama*,
271 Fed. App'x (11th Cir. 2008) ................................................................................................12

*Velez v. Novartis Pharms. Corp.*,
2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ........................................................................24

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ....................................................................................................24

*Waters v. Int'l Precious Metals Corp.*,
190 F.3d 1291 (11th Cir. 1999) ..................................................................................................19

**Rules**

Federal Rule of Civil Procedure 23.1 ..........................................................................................1, 12

Plaintiff,[1] through his counsel of record, respectfully moves the Court, and submits this memorandum in support of his motion, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure ("Rule 23.1"), for final approval of the proposed settlement (the "Settlement") and seeks entry of the [Proposed] Judgment ("Judgment") and [Proposed] Order Approving Derivative Settlement and Order of Dismissal with Prejudice submitted herewith.  The Settlement resolves the above-captioned stockholder derivative action ("Action") brought on behalf of Rayonier Inc. ("Rayonier" or the "Company"), and litigation demands ("Demands") issued to Rayonier's Board of Directors (the "Board") by Rayonier stockholders Dave Molloy, John G. Bradley, Asif Mehdi, Donald Blanchard and Samuel Koenig (together with Plaintiff, the "Stockholders").[2]

## MEMORANDUM OF LEGAL AUTHORITY

## I.    INTRODUCTION

Through the instant Motion, the Stockholders seek final approval of the Settlement.  The Litigation arises out of Rayonier's alleged material overstatement of the Company's merchantable timber inventory and overharvesting of timberlands in the Pacific Northwest and related overstatement of income.  After a significant, multi-year effort by Stockholders' Counsel, on behalf of Rayonier, including three in-person mediation sessions, the review of over 1.5 million pages of documents, the retention of experts, and Rayonier's agreement to a substantial overhaul

---

[1] All capitalized terms contained herein shall have the same meanings as set forth in the Settling Parties' Stipulation and Agreement of Settlement filed April 17, 2018 (the "Stipulation"), unless otherwise noted.  ECF No. 31-1.  Pursuant to Local Rule 3.01(g), counsel for Plaintiff conferred with counsel for Rayonier and the Individual Defendants.  Rayonier and the Individual Defendants do not necessarily adopt or agree with all of the arguments, statements, facts, characterizations, or positions asserted by Plaintiff in this Motion and state that the Stipulation speaks for itself.  Rayonier and the Individual Defendants, however, do not oppose the relief sought in this Motion.

[2] The Demands and the Action are collectively referred to as the "Litigation."

of the Company's internal controls over its timber inventory procedures, among other things, the parties reached a Settlement that they agree is fair, reasonable, adequate, and confers substantial benefits on Rayonier.

The Settlement requires the implementation of comprehensive and meticulous corporate governance enhancements and remedial measures (the "Reforms"). These Reforms were negotiated and agreed upon with the assistance of the Stockholders' experts, Donald Reimer, Ph.D. ("Dr. Reimer"), an expert in timber growth and yield analysis and sustainability planning, and Kimberly Iles, Ph.D. ("Dr. Iles"), an expert in timber inventory. As set forth in their Joint Declaration, "it is our opinion that the Company's adoption of the proposed revisions to its Inventory Procedures will improve the quality, reliability and timeliness of information crucial to oversight, management and sustainability of Rayonier's timberlands and if followed will help prevent the recurrence of the conduct and practices at issue in this shareholder derivative action."[3] For example, the Inventory Policy, standing alone, provides invaluable, substantial benefits to Rayonier. It is a comprehensive set of multi-layered internal controls designed to ensure that timber inventory is properly monitored, overseen, and disclosed. In addition to the revised inventory processes and procedures required to be followed, the Inventory Policy now mandates substantial and meaningful Board involvement in reviewing timber inventory monitoring, with specific provisions for presentation of significant data directly to the Board to allow it to objectively monitor timber inventory, roll-forwards of timber inventory, and future harvest schedule. *See id.* § VII.

The Inventory Policy also requires significantly enhanced oversight by the Land

---

[3] *See* § VIII of the Joint Declaration of Don Reimer, Ph.D and Kim Iles, Ph.D ("Expert Decl."), attached as Exhibit 1 to the Declaration of Stockholders' Counsel in Support of Plaintiff's Unopposed Motion for Final Approval of Derivative Settlement and Approval of the Agreed-Upon Attorneys' Fees and Expenses ("Joint Decl."), submitted herewith.

Information Systems ("LIS") department, including more frequent stand edits and updates to timber sales. It also provides necessary rules and procedures to ensure the reliability and validity of Rayonier's timber inventory monitoring. *See id.* § VI. Projections and stand values must be cross-checked with previous measurements, growth rates must be compared to changes in inventory, and roll-forwards in inventory must be reviewed and cross-checked. Consistent and objective standards must be applied across all of Rayonier's U.S. operations to ensure non-merchantable timber is not included in inventory forecasts. Rayonier is also obligated to use external, independent sources for timber growth rates to verify roll-forwards in inventory.

Rayonier's timber inventory monitoring will also no longer controlled by management. As a result of the settlement, the Company now has a Senior Manager of Internal Controls, who works in consultation with the LIS department to evaluate Rayonier's processes and controls related to merchantable timber inventory, and has a duty to ensure risks are appropriately evaluated and addressed. The Director, LIS, and Director of Accounting Operations must now meet with the Audit Committee to discuss the annual timber report and calculation of new depletion rates.

The Settlement also substantially heightens Rayonier's compliance controls. For example, the Audit Committee is now responsible for assisting the Board in overseeing disclosure controls and procedures and internal controls over financial reporting. To help assist the Audit Committee in fulfilling these duties, the Audit Committee now receives direct reports on various matters from, among others, the independent auditor, the Ombudsman (who serves as a confidential contact to provide guidance on compliance issues), and the Chief Compliance Officer, respectively, as well as reports of any complaints made through the Rayonier's Whistleblower Hotline. The Audit Committee must also have separate executive sessions with

management, internal auditors, and independent auditors.

In sum, the Settlement provides significant benefits to Rayonier and its stockholders, and, notably, the Stockholders secured these substantial benefits despite circumstances that made a greater recovery on behalf of Rayonier highly uncertain. As stated in Nominal Defendant Rayonier's Supplemental Authority in Support of Motion for Preliminary Approval of Derivative Settlement, "if this action had not settled, Rayonier intended to move to dismiss the action on the basis of the [SLC's] determination" that pursuing the derivative claims "would not be in the best interests of the Company." Supp. Auth. at 2, 5. "[T]he only issue before the Court in ruling on the motion would have been (1) whether the [SLC] members were independent; (2) whether the investigation was reasonable; and (3) whether the [SLC] acted in good faith." *Id*. at 6. Defendants adamantly maintain that the SLC and its investigation, which entailed reviewing over 360,000 documents and interviewing 17 witnesses over six months, among other things, satisfied these requirements, necessitating dismissal. *See id*.

Despite these daunting odds, Stockholders and Stockholders' Counsel dedicated significant time and effort, and incurred substantial costs to achieve a Settlement that transforms Rayonier's practices and controls. Rayonier acknowledges that the said Reforms confers a substantial benefit upon the Company. *Id.* ¶ 2.1.

In recognition of these benefits, the Individual Defendants' insurers have agreed to pay Stockholders' Counsel the Agreed-upon Fees in the amount of $1,995,000, subject to Court approval. Significantly, the Board has, in the exercise of its business judgment, approved the Settlement, including the Agreed-Upon Fees, as in the best interests of Rayonier and Current Rayonier Stockholders. *Id.* In sum, the Settlement is an outstanding result for Rayonier, and should be approved in its entirety.

## II.    BACKGROUND OF THE ACTION AND SETTLEMENT

### A.    Stockholders Issue Litigation Demands on the Board

Between November 2014 and May 2015, the Stockholders issued the Demands on the Board, demanding that the Board investigate and take action against certain of the Company's current and former directors and executive officers for, among other things, allegedly breaching their fiduciary duties in connection with the overstatement of the Company's merchantable timber inventory and alleged overharvesting of the Company's timberlands.  Stipulation § I; Joint Decl. ¶ 15.  The Board formed an SLC to investigate the allegations.  Stipulation § I.

After issuing their respective Demands, the Stockholders entered into a series of tolling agreements (the "Tolling Agreements") with Rayonier providing that the Stockholders would refrain from commencing derivative action(s) until the occurrence of certain triggering events. *Id.* § I.   Rayonier agreed to produce copies of documents and written discovery responses produced by Rayonier in a related federal securities class action captioned *In re Rayonier Inc. Securities Litigation*, No. 3:14-cv-01395-TJC-JBT, then pending in the U.S. District Court for the Middle District of Florida (the "Securities Action").  *Id.*

### B.    Certain of the Settling Parties Attend the First Mediation

Pursuant to the Tolling Agreements, on April 7, 2016, certain of the Settling Parties participated in a joint mediation of the Demands and the Securities Action with Jed D. Melnick of JAMS in New York, New York (the "First Mediation"), but neither the Demands nor the Securities Action were resolved.  *Id.*  Prior to the First Mediation, the Stockholders submitted a settlement demand and provided a detailed 26-page mediation statement, excluding exhibits.

### C.    Stockholders' Counsel Receive and Review 1.5 Million Pages of Documents

On May 20, 2016, this Court denied the defendants' motion to dismiss in the Securities Action, and thereafter the parties to the Securities Action commenced discovery.  Stipulation § I.

Pursuant to the Tolling Agreements, Rayonier provided the Stockholders with over 1.5 million pages of documents produced by Rayonier in the Securities Action, which counsel for the Stockholders reviewed and analyzed. *See id.* In order to achieve efficiency and avoid duplication, the documents produced by Rayonier were divided roughly equally among Stockholders' Counsel for review. Stockholders' Counsel then each culled the critical documents that were then available to all Stockholders' Counsel.

> **D.    Certain of the Settling Parties Attend the Second Mediation and Continue to Engage in Settlement Discussions Thereafter**

On March 6, 2017, certain of the Settling Parties and certain of the D&O Insurers participated in another mediation session simultaneously with a mediation of the Securities Action with the Honorable (Ret.) Layn R. Phillips ("Judge Phillips") of Phillips ADR in New York, New York. *Id.* In advance of this second mediation (the "Second Mediation"), the Stockholders submitted a 25-page detailed mediation statement relying on key non-public documents that had been produced by the Company. *Id.* Although progress was made at the Second Mediation, neither the Demands nor the Securities Action was resolved. *Id.*

Shortly thereafter, on March 13, 2017, Rayonier publicly announced that an agreement-in-principle had been reached to settle the Securities Action. *Id.* Between the Second Mediation and November 27, 2017, the Settling Parties continued to engage in good faith, arm's-length negotiations regarding a potential resolution of the Demands. *Id.* Specifically, in late March 2017, Rayonier responded to the Stockholders' settlement demand, and, at Stockholders' request, Rayonier provided a summary of Rayonier's then-current practices relating to inventory management. *Id.* The Stockholders' experts, Drs. Reimer and Iles, assisted in Stockholders' Counsel's analysis and provided recommendations to improve Rayonier's timber inventory practices and policies. *Id.* Based on discussions and consultation with Drs. Reimer and Iles, the

Stockholders made additional requests for information to Rayonier and Rayonier responded to such requests. Over the next several months, the Settling Parties continued their arm's-length negotiations and exchanged multiple drafts of the proposed settlement terms.

**E.      Plaintiff Files the Action**

On October 13, 2017, Plaintiff commenced the Action asserting derivative claims against the Individual Defendants relating to the alleged misconduct set forth in the Demands. Plaintiff's Complaint made extensive use of a number of non-public documents produced by Rayonier pursuant to the Tolling Agreements. ECF No. 1.

**F.      The Settling Parties Continue Arm's-Length Settlement Discussions and Reach an Agreement-in-Principle**

Following the filing of the Action, the Settling Parties continued their settlement discussions. Stipulation § I. On November 27, 2017, the Settling Parties executed a term sheet memorializing the terms of an agreement. *Id.* On February 22, 2018, the Board, in the exercise of its business judgment, approved the Settlement, with any fee award to be paid by the D&O Insurers, as in the best interests of Rayonier and its stockholders. *Id.*

**G.      The Stockholders, Rayonier and Its Insurers Mediate and Agree to an Appropriate Amount of Attorneys' Fees and Expenses**

With the material terms of the Settlement agreed to, the Settling Parties began negotiations regarding the attorneys' fees and expenses to be paid to Stockholders' Counsel in recognition of the substantial benefits conferred upon the Company as a result of the Settlement. Unable to reach an agreement on their own, counsel for the Stockholders, Rayonier and certain of the D&O Insurers attended a full day mediation on March 13, 2018, in New York City with mediator Michelle Yoshida ("Mediator Yoshida") of Phillips ADR (the "Fee Mediation"). At the conclusion of the Fee Mediation, the D&O Insurers, on behalf of Defendants, agreed to pay $1,995,000 to Stockholders' Counsel, subject to approval by the Court. On April 16, 2018, the

parties executed the Stipulation.

**H.      Preliminary Approval and Notice to Current Rayonier Stockholders**

On April 17, 2018, Plaintiff filed the Unopposed Motion for Preliminary Approval of Derivative Settlement.  ECF No. 31.  During a July 2, 2018 telephonic hearing on Plaintiff's Motion for Preliminary Approval, the Court requested supplemental briefing regarding the litigation hurdles Plaintiff faced, particularly Defendants' anticipated motion to dismiss based on the SLC's recommendation of dismissal.  In response, on July 23, 2018, Rayonier submitted its Supplemental Authority, explaining that "North Carolina law require[s] dismissal if the Special Committee members were independent, their investigation was reasonable, and they acted in good faith."  ECF No. 48 at 6.  The Supplemental Authority then previewed Defendants' arguments as to why the SLC members were independent, acted in good faith, and conducted a reasonable investigation, thereby requiring dismissal.  *Id.*  Attached as Exhibit 1 to the Supplemental Authority was the SLC's 57-page report, "explaining the basis for its unanimous determination that 'it would not be in the Company's best interests for it or the demanding shareholders to assert or pursue any claims'" regarding the alleged wrongdoing.

On August 17, 2018, the Court entered the Preliminary Approval Order.  Pursuant to the Preliminary Approval Order, on August 23, 2018 Rayonier caused a copy of the Summary Notice to be filed with the Securities Exchange Committee ("SEC") on a Form 8-K.  On August 24, 2018, Rayonier posted the Stipulation and Notice on the Company's Investor Relations page and caused a copy of the Summary Notice to be published online on *Investors.com*.  In addition, on August 27, 2018, Rayonier published the Summary Notice in the printed edition of *Investor's Business Daily*.  The deadline for Current Rayonier Stockholders to object to the Settlement is September 25, 2018.  To date, there have been no objections by Current Rayonier Stockholders.

III.    **THE SETTLEMENT CONFERS SUBSTANTIAL BENEFITS ON RAYONIER**

The Settlement is an excellent result for Rayonier, reached after extensive, arm's-length negotiations among the Settling Parties.  Rayonier and the Stockholders agree that the Reforms provide a substantial benefit to Rayonier.  These Reforms include, among other things:

A.    **Comprehensive Written Inventory Policy**

The Board agreed to adopt a comprehensive written Inventory Policy, attached as Exhibit A to the Stipulation, which substantially and meaningfully enhances Rayonier's current controls to monitor timber inventory, growth rates, and depletion rates, including significant communications to the Board concerning the Company's timber inventory monitoring. Stipulation ¶ 2.1(a).  The Inventory Policy was developed with the substantial input of Drs. Reimer and Iles, and requires that, among other things:

(a)    the Board be provided at least annually with information to ensure the reliability and validity of the Company's timber inventory monitoring, including, comparisons of past projections to current measurements and volumes, and confirmation that field work audits are readily available for review by an additional qualified party, at the discretion of the Board (Stipulation, Ex. A at 2);

(b)    Rayonier maintain procedures for the application of consistent, objective, and transparent standards across its U.S. operations in order to ensure the exclusion of non-merchantable inventory (*id.*);

(c)    the Board be provided with information concerning the verification of the roll-forward of timber inventory from the prior year, including: (i) external data used for growth estimates to ensure they are properly representative of Rayonier timberland; (ii) growth rates confirmed by comparison to growth rates and inventory levels; and (ii) explanation for any material variance in the roll-forward of timber inventory by the Director of the Company's Land

Information Systems department (*id*. at 4);

      (d)    the Company maintain policies to ensure that harvest cutout volumes are not used to adjust timber inventory (*id*. at 5-6);

      (e)    the Board be presented annually with an extended harvest schedule, including graphics for the United States South and Pacific Northwest timberlands, for not less than 30 years (and preferably for a period equal to two rotations) (*id.*);

      (f)    internal audit, at least annually, will test Rayonier's internal controls over timber inventory and depletion rates (*id.* at 8);

      (g)    the Company use of external, independent sources for timber growth rates to verify roll-forward rates must be carefully justified so that they can be explained to the Board, Board committees, and the external auditor (*id.* at 9); and

      (h)    adjustments to growth rates must be based on appropriate measurement data from Rayonier's stands, and should be made based on measurements periods of 5 or more years (*id.*).

### B.    Disclosure Committee

Rayonier's Disclosure Committee will review the Company's reporting of merchantable timber inventory to ensure its accuracy.  Stipulation ¶ 2.1(b).

### C.    Audit Committee

The Board has agreed to revise the Charter of the Audit Committee.  Stipulation ¶ 2.1(c) and Exhibit B. Specifically, the Audit Committee's duties shall be enhanced to include: (i) responsibility for assisting the Board in overseeing the Company's disclosure controls and procedures and internal controls over financial reporting; (ii) periodic meetings in separate executive sessions with management (including the CFO and Chief Accounting Officer), the internal auditors and the independent auditors; and (iii) responsibility for the compensation and oversight of the work of the independent auditor (including resolution of disagreements between

management and the independent auditor regarding financial reporting), and the independent auditor shall report directly to the Audit Committee.  *Id.* ¶ 2.1(c) & Ex. B.

### D.    Whistleblower Hotline

Rayonier shall continue to engage an independent, third-party supplier to provide and monitor a whistleblower hotline, which Rayonier will conspicuously and widely post on its website and elsewhere.  Stipulation ¶ 2.1(d).  On a monthly basis, the supplier will report to the Chair of the Audit Committee any whistleblower complaint the supplier has received.  *Id.*

### E.    Senior Manager of Internal Controls

Management created a position (Senior Manager, Internal Controls) to provide additional oversight and ensure risks are appropriately evaluated and addressed.  Stipulation ¶ 2.2(a).  As part of Rayonier's enhanced Inventory Policy, Rayonier shall ensure that this position is appropriately staffed, and that the Senior Manager of Internal Controls works in consultation with the LIS department to evaluate Rayonier's processes and controls related to merchantable timber inventory.  *Id.*

### F.    Enhanced Review of Inventory, Depletion, and Harvest Schedule

The Director, LIS, and the Director of Accounting Operations (or persons with similar functions) now meet with the Audit Committee to discuss the annual timber report and the calculation of new depletion rates (including methods of inventory measurement and verification and large edits to inventory).  Stipulation ¶ 2.2(b)(1).  Rayonier also now prepares a report comparing harvest cutout to inventory, and if any variances are noted, a discussion with external auditors is held to discuss if any adjustments to timber inventory are appropriate.  *Id.* ¶ 2.2(b)(2).  In addition, an extended harvest schedule for the Southern and Pacific Northwest regions is presented to the Board.  *Id.* ¶ 2.2(b)(3).

### G.    Changes to Compliance Procedures

The Ombudsman who serves as a confidential contact to provide guidance on issues relating to Rayonier's Code of Conduct and compliance obligations reports directly to the Audit Committee (instead of a management-led risk committee).  Stipulation ¶ 2.2(c).  In addition, the Chief Compliance Officer must now report directly to the Audit Committee, and has authority to communicate personally with the Audit Committee promptly on any matter.  *Id*.

### H.    Changes to Accounting and Audit Procedures

The Audit Committee has enhanced duties that relate to Rayonier's internal audit function, including that the Audit Committee review and approve: (i) the purpose, authority, and organizational reporting lines; (ii) annual audit plan, budget, and staffing; and (iii) concurrence in the appointment and compensation of the director of internal audit.  Stipulation ¶ 2.2(d).

## IV.    THE SETTLEMENT SHOULD BE FINALLY APPROVED

### A.    Standards for Judicial Approval of a Derivative Settlement

Plaintiff seeks final approval of the Settlement pursuant to Rule 23.1.  The general standard for final approval of a proposed settlement is whether the proposed settlement is "fair, adequate and reasonable" and has been entered into without collusion between the parties. *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *United States v. Alabama*, 271 Fed. App'x, 896, 900 (11th Cir. 2008); *In re Smith*, 926 F.2d 1027, 1028-29 (11th Cir. 1991).  In applying this standard, the Court considers whether, in light of the claims and defenses asserted by the parties, the proposed compromise represents a "reasonable evaluation of the risks of litigation."  *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960).  The trial judge is not required to decide the merits of the action or substitute a different view of the merits for that of the parties or counsel.  *See Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983).

Federal courts have consistently held that, as a result of their highly favored status,

settlements "'will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits.'"  *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977) (quoting *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176 (5th Cir. 1975)).  And, "[s]ettlements of shareholder Actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'"  *Maher*, 714 F.2d at 455 (quoting *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973)).

The Eleventh Circuit considers the following factors when reviewing a proposed settlement for approval: (1) the absence of collusion between the parties; (2) the stage of the proceedings at which settlement was achieved; (3) the likelihood of success at trial; (4) the range of possible recovery; (5) the complexity, expense, and likely duration of the litigation; and (6) the substance and amount of opposition to the settlement.  *Bennett v. Behring Corp*., 737 F.2d 982, 986 (11th Cir. 1984); *Cotton*, 559 F.2d at 1330; *Figueroa v. Sharper Image Corp*., 517 F. Supp. 2d 1292, 1311-16, 1319-20 (S.D. Fla. 2007); *see also Maher*, 714 F.2d at 456-57, 460-61. As detailed below, each of the *Bennett* factors weighs in support of Settlement approval.

### B.     The Settlement Was Not the Result of Fraud or Collusion

The absence of collusion is a factor weighing heavily in favor of settlement approval. *Bennett*, 737 F.2d at 986; *Maher*, 714 F.2d at 457 (holding that a settlement must be "free from collusion or fraud").  The Settlement was achieved after extensive arm's-length, good-faith negotiations among experienced, qualified counsel and with the substantial assistance of two experts in the timber industry and attendance at two all-day, in-person mediations.  *See Maher*, 714 F.2d at 456-57 (explaining that a finding that the "settlement was the result of arm's-length negotiation" is a factor in approving the settlement); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 633 (1997) (settlement approved because, in part, it was the product of arm's-length negotiations).

In addition, the Settling Parties' negotiations regarding the Agreed-Upon Fees, which took place with the assistance of Mediator Yoshida, did not begin until after the Reforms were negotiated and agreed upon. The separate negotiation of the Agreed-Upon Fees, with the assistance of a mediator, further supports that the Settlement was free from fraud and collusion. *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (finding absence of collusion where parties negotiated a settlement under the auspices of a highly experience mediator and "the fee was negotiated separately from the rest of the settlement"). Thus, the absence of any fraud or collusion supports final approval of the Settlement.

### C.    The Stage of the Proceedings

In evaluating whether to approve a settlement, the Court should also consider the "stage of proceedings at which the settlement was achieved." *Bennett*, 737 F.2d at 986. Here, the Settlement has been reached at a stage where the parties were well-informed of the strengths and weaknesses of the claims, but also before incurring exorbitant expenses in connection with dispositive motions, further discovery, and trial preparation. Before and after making the Demands, Stockholders' Counsel conducted extensive research and investigation into the Individual Defendants' alleged misconduct and the corresponding damages to the Company. Stipulation § II. Stockholders' Counsel's factual investigation included, among other things, over 1.5 million pages of internal documents produced by Rayonier, which Stockholders' Counsel diligently and carefully reviewed and analyzed. *Id.* § I.

Having completed sufficient investigation to properly evaluate the derivative claims on both a factual and legal basis, Stockholders' Counsel negotiated and achieved an excellent settlement for Rayonier, and eliminated the substantial risk and uncertainty of continued litigation. *See Cotton*, 559 F.2d at 1332 (finding that based upon informal discovery and investigation, plaintiffs "achieved the desired quantum of information necessary to achieve a

settlement"); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("[f]ormal discovery is not a necessary ticket to the bargaining table" where the parties have sufficient information to make an informed decision about settlement). Thus, this factor also supports approval of the Settlement.

### D.    The Likelihood of Success at Trial

When evaluating the fairness of a settlement, the Court will also balance the likely rewards of litigation with its risks and costs, against the benefits obtained by the settlement. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).

Stockholders believe that the claims and contentions have merit. Nonetheless, Stockholders faced formidable obstacles preventing them from even reaching the merits, much less reaching a successful result at trial. Absent the Settlement, Defendants would have moved to dismiss the Action based on the SLC's finding that there was "insufficient evidence of any deliberate wrongdoing" and that "such legal action would not be in the best interests of the Company." Supplemental Authority at 2, 5. As detailed in Rayonier's Supplemental Authority, dismissal is required under North Carolina law "if [an SLC] determines in good faith after conducting a reasonable inquiry upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interests of the corporation.'" *Id.* at 4. Defendants maintain that each of these requirements have been met because: (i) all three of the SLC members were purportedly independent because they "were fairly new to the Rayonier Board[,] none had been a member of the Board during the period in which the purported misconduct occurred[, and they] did not have any personal or other interests that would prevent them from making a decision in Rayonier's best interests" (*id.* at 6-8); and (ii) the SLC's investigation was reasonable and it acted in good faith, as "[t]he 'depth and breadth of this investigation' –

including 17 witness interviews, the substantial document review, and the 57-page report – 'demonstrates … that the SLC approached this investigation with sincerity as it notably reflected in the act of engaging independent, unbiased counsel to conduct an extensive investigation'" (*id.* at 9-10). If the Court agreed with Defendants, it would be required to "defer to the Board's business judgment" and dismiss the claims. *Id.* at 4.

Even if the Complaint survived the anticipated motion to dismiss, many challenges to recovery would remain. *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("the odds of winning [a] derivative lawsuit [are] extremely small"). Defendants have denied, and continue to deny, any liability or wrongdoing with respect to any and all claims and contentions alleged in the Litigation. *See* Stipulation § III. In addition, Plaintiff faced the customary risks of trial, namely: (i) conflicting witness and expert testimony and evidence; (ii) the unpredictability of a lengthy and complex trial; (ii) witnesses unavailability; and/or (iv) the trier of fact could react to the evidence in unforeseen ways. Joint Decl. ¶ 35.

A reasonable evaluation of the risks in this litigation evidences that the continued litigation presented substantial risk and militates in favor of this Court's approval of the Settlement, which provides immediate, substantial benefits to Rayonier. *See, e.g.*, *Maher*, 714 F.2d at 458, 460-61 (affirming approval of derivative settlement where further recovery "was problematical" and "did not outweigh the costs, both legal and otherwise" and a board committee had recommended that settlement was in the best interest of the company).

### E.    The Range of Possible Recovery

As acknowledged in *Maher*, the Court should place less emphasis on the range of possible recovery because it naturally lends itself to a discussion of the range of monetary recovery as is usually seen in class actions, and not necessarily the range of equitable benefits as is often present in the settlement of the derivative litigation. 714 F.2d at 460-61. That being

said, even if Stockholders were successful in establishing liability at trial, they would face certain risks in proving and obtaining equitable relief for Rayonier, especially since the Securities Action settlement did not require Rayonier to pay any damages beyond that paid by its insurers, which eliminated a large portion of the alleged damages.  Joint Decl. ¶ 36.

In the face of uncertain recovery and damages, Stockholders secured an immensely valuable Settlement.  Stockholders' Counsel, in conjunction with their experts, have transformed Rayonier's timber inventory procedures to a state where it is extremely unlikely that Rayonier will incur similar errors in timber inventory again.  Avoiding this misconduct in the future is invaluable.  Accordingly, the benefits achieved for Rayonier demonstrably fall within the range of reasonableness.

### F.    The Complexity, Expense, and Likely Duration of This Litigation

The Court should also consider the complexity, expense, and likely duration of the Litigation.  *Protective Comm.*, 390 U.S. at 424.  Without this Settlement, the Litigation would require additional large expenditures and potentially years of litigation, with the risk that Rayonier could obtain results less beneficial than the ones provided by the Settlement.  At the outset, responding to Defendants' anticipated motion to dismiss based on the SLC's recommendation would be a significant undertaking, as Stockholders would have to conduct discovery into the SLC's independence and good faith, its investigation, and ultimate conclusion that it was not in the best interests of Rayonier to pursue the litigation.  And, despite these efforts, there was still a very real risk that this Action would not make it past the motion to dismiss. *See supra* at 15, 16.

Even presuming the Action survived Defendants' motion to dismiss and other dispositive pre-trial motions, any trial would unquestionably entail several weeks and involve the introduction of hundreds of exhibits, vigorously contested motions, conflicting expert testimony,

and the expenditure of hundreds of thousands of dollars in additional out-of-pocket expenses. Any future trial judgment would still be subject to the continuing risks and vicissitudes of litigation, through possible appeals. Experience shows that even very large judgments, recovered after lengthy litigation and trial, can be greatly reduced or even completely lost post-trial or on appeal. *See, e.g.*, *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1340 (11th Cir. 1999) (affirming reduction of $45 million punitive damage award to $4.35 million); *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1477 (11th Cir. 1989) (affirming reduction of $18.5 million punitive damage award to $2 million); *In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731, at *6 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL 5927988 (9th Cir. June 23, 2010) (overturning a jury verdict of $277 million in favor of stockholders on motion for judgment as a matter of law). Thus, this factor also weighs in support of final approval of the Settlement.

### G.    The Opinion of Rayonier Stockholders

The Court should also consider Rayonier's stockholders' reaction to the Settlement. *Bennett*, 737 F.2d at 986. The deadline for Current Rayonier Stockholders to object to the Settlement is September 25, 2018. After the September 25 deadline has passed, Plaintiff will update the Court on Current Rayonier Stockholders' reaction to the Settlement.

In sum, each of the *Bennett* factors supports that the Settlement is fair, reasonable, and adequate, and should be finally approved by the Court.

## V.    THE AGREED-UPON FEES SHOULD BE APPROVED

After the Settling Parties negotiated the substantive terms of the Settlement, they began negotiating, with the substantial assistance of Mediator Yoshida, the amount of attorneys' fees and expenses to be paid to Stockholders' Counsel in recognition of the substantial benefits achieved. Subject to Court approval, the Individual Defendants' insurers have agreed to pay an aggregate amount of $1,995,000 to Stockholders' Counsel. For the reasons discussed below,

Plaintiff submits that the Agreed-Upon Fees are fair and reasonable and should be approved.

### A.     Applicable Legal Standards

The Eleventh Circuit follows the Fifth Circuit's *Johnson v. Georgia Highway Express, Inc.*, decision, which provides guidelines to consider when assessing the reasonableness of attorney's fees.  488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92 (1989); *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 & n.2 (11th Cir. 2008); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294 & n.5 (11th Cir. 1999). These guidelines include, consideration of: (i) the novelty and difficulty of the questions; (ii) the skill necessary to perform the legal service properly; (iii) the preclusion of other employment by the attorney due to acceptance of the case; (iv) whether the fee is fixed or contingent; (v) the amount involved and the results obtained; (vi) the experience, reputation, and ability of the attorneys; and (vii) awards in similar cases.  *See Johnson*, 488 F.2d at 718-19.  The application of these guidelines supports a finding that the Agreed-Upon Fees is eminently fair and reasonable and should be approved.

### 1.     The Novelty and Difficulty of the Questions and Skill Necessary

Stockholder actions are complex by their very nature.  *Clark v. Lomas & Nettleton Fin. Corp.*, 79 F.R.D. 641, 654 (N.D. Tex. 1978), *vacated on other grounds by*, 625 F.2d 49 (5th Cir. 1980); *see also Ross v. Bernhard*, 396 U.S. 531, 545 n.5 (1970) (stating that issues in stockholder derivative suits are likely to be complex).  Stockholders' Counsel had to research and analyze complex factual and legal issues, related to, among other things: (i) sustainable harvesting practices; (ii) reforestation and silvicultural efforts; (iii) sustainable yields and annual harvest levels; (iv) the impact of non-merchantable timber in restricted, environmentally sensitive and/or economically inaccessible areas; (v) legal issues related to the claims and alleged damages, including legal issues related to the Defendants' anticipated motion to dismiss based on the SLC's

recommendation; and (vi) corporate governance best practices designed to remedy the alleged lack of internal controls that allowed the alleged wrongdoing to occur. Joint Decl. ¶ 42. Indeed, this Action was so novel and difficult that Stockholders' Counsel retained Dr. Reimer, an expert in timber growth and yield analysis and sustainability planning, and Dr. Iles, an expert in timber inventory techniques to assist in Stockholders' Counsel's analysis of information provided by Rayonier and to provide recommendations to improve Rayonier's timber inventory practices and policies.

Accordingly, the novelty and difficultly of the legal and factual issues faced by Stockholders' Counsel support a finding that the requested Agreed-Upon Fees are reasonable.

## 2. The Preclusion of Other Employment by Stockholders' Counsel

Stockholders began investigating the derivative claims on behalf of Rayonier prior to serving the Demands back in November 2014. Joint Decl. ¶ 44. After serving the Demands, Stockholders' Counsel's factual investigation and analysis of the law continued, and ultimately resulted in Stockholders' Counsel negotiating for Tolling Agreements to ensure the statute of limitations would not expire. In exchange, Rayonier provided Stockholders with over 1.5 million pages of documents. Stockholders' Counsel diligently reviewed the documents and ultimately cited them extensively in the Complaint. Stockholders' Counsel's unwavering commitment to the Litigation and Rayonier continued through settlement negotiations, which were contentious and took many months, with the substantial assistance of Stockholders' Counsel's experts in timber harvesting and inventory.

These significant efforts, which took place over the last four years, involved the expenditure of substantial resources, including a collective 4,320.65 hours spent by Stockholders' Counsel's attorneys and professional staff, and over $200,685.23 in expenses. *Id.* Thus, Stockholders' Counsel's acceptance of the prosecution of the Litigation necessarily precluded

them from devoting the resources used in the Litigation to the prosecution of additional cases. *Id*. Accordingly, this factor supports finding the Agreed-Upon Fees reasonable.

### 3.   Whether the Fee Is Fixed or Contingent

Courts have consistently recognized that another important factor in evaluating an application for fees is the contingent nature of the fee. *Johnson*, 488 F.2d at 718-19; *Bivins*, 548 F.3d at 1350. When Stockholders' Counsel undertook this contingent representation, it was with the expectation that they would have to devote many hours of hard work to the prosecution of a case involving complex factual and legal issues without any assurance of ever getting paid for their efforts. Joint Decl. ¶ 46. Here, Stockholders' Counsel received no compensation during the course of the Litigation and have incurred significant expenses. *Id*. Any compensation has always been at risk. Thus, the risk assumed by Stockholders' Counsel of potentially receiving no compensation, or reimbursement of expenses, is further support for the requested Agreed-Upon Fees.

### 4.   The Amount Involved and Results Achieved

Stockholder derivative cases have long been a favored means for enforcing standards of conduct for corporate officers and directors and, in doing so, creating a common benefit to the corporation. *Surowitz v. Hilton Hotels Corp*., 383 U.S. 363, 371 (1966). In a derivative context, "a settlement may fairly, reasonably, and adequately serve the best interest of a corporation, on whose behalf the Action is brought, even though no direct monetary benefits are paid by the defendants to the corporation." *Maher*, 714 F.2d at 466. As discussed at length above, the comprehensive nature of Reforms that Stockholders' Counsel achieved for the benefit of Rayonier supports the reasonableness of the Agreed-Upon Fees. *See supra* at 9-12.

### 5.   The Experience, Reputation, and Requisite Skill of the Attorneys

Counsel for all Settling Parties are members of reputable law firms, have litigated

complex stockholder actions for many years, and are well-versed in the applicable law pertaining to fee awards.[4]  The Settling Parties' negotiations regarding the Agreed-Upon Fees were based upon a knowledgeable and thorough analysis of what an appropriate fee would be in light of the substantial benefits achieved.  Joint Decl. ¶ 49.  The end result of the Settling Parties' informed negotiations is entitled to a great deal of weight in evaluating Plaintiff's request for approval of the Agreed-Upon Fees.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *see also Johnson*, 488 F.2d at 720 ("in cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorneys' fees").  In light of Stockholders' Counsel's extensive experience, as well as the quality of Stockholders' Counsel's work product, preparation, and ability, the Court should find the Agreed-Upon Fees reasonable.

### 6.    Awards in Similar Cases

The Agreed-Upon Fees compares favorably to amounts awarded to compensate attorneys in other stockholder derivative cases, especially in light of the substantial benefits obtained through the Settlement.  *See Kloss v. Kerker*, No. 502010CA018597XXXXMB, slip op. (Fla. Cir. Ct. May 27, 2011) (approving fees of $3.5 million, less than a year after the action was filed and before discovery commenced, where settlement provided corporate governance reforms directly addressing allegations made in complaint); *Carbon Cty. Emps.' Ret. Sys. v. Kelly,* No. 08-8692, slip op. (Tex. Civ. Ct. Dallas Cty. Dec. 7, 2009) (approving fees of $3.5 million where settlement provided corporate governance reforms that were negotiated with the input of an industry expert); *Cty. of York Emps. Ret. Plan v. Jung*, No. 651304/2010, slip op. (NY Sup. Ct. Aug. 3, 2016) (approving fees of $4 million, after briefing a motion to dismiss, but adjourning

---

[4] The background, experience, and accomplishments of Stockholders' Counsel are summarized in the firm resumes attached to the Joint Decl. as Exhibits 3A, 4A, 5A, 6A and -7A.

oral argument pending settlement discussions, where settlement provided corporate governance reforms targeted at remedying purported FCPA violations); *Rosenfeld v. Campenelli*, No. 13-135711, slip op. (Mich. Cir. Ct. July 7, 2015) (approving fees of $4.3 million where settlement provided corporate governance reforms directly addressing allegations made in complaint); *In re Alphatec Holdings, Inc. Derivative S'holder Litig.*, No. 37-2010-00058586, slip op. (Cal. Super. Ct. Aug. 18, 2014) (approving fees of $5.25 million where settlement provided corporate governance reforms that recognized certain tone-at-the-top changes and strengthened controls over related-party transactions), attached to the Joint Decl. as Exhibits 8-12.

Further, in total, Stockholders' Counsel expended 4,320.65 hours on the investigation, prosecution, and resolution of the claims through April 16, 2018 (i.e., the date of the Stipulation) for an aggregate lodestar of $2,479,368.50. Stockholders' Counsel have made a concerted effort throughout the course of the Action to delegate work in a balanced and efficient manner to accomplish a successful result. *See* Joint Decl. ¶¶ 53-54. In addition, Stockholders' Counsel incurred a total of $200,685.23 in unreimbursed expenses in connection with the prosecution and settlement of the Action. Overall, Stockholders' Counsel's fee request results in a fractional multiplier of approximately 0.72 on Stockholders' Counsel's total lodestar. Joint Decl. ¶¶ 55-56; *see also* Exhibits 3-7 of the Joint Decl. for a detailed description of each Stockholders' Counsel's time and expenses. The multiplier here falls well within the range of multipliers awarded in other complex cases by courts in this Circuit and elsewhere. *See, e.g.*, *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1343-44 (S.D. Fl. 2007) (recognizing that "lodestar multiples 'in large and complicated class actions' range from 2.26 to 4.5, while 'three appears to be the average," and holding that the "fee request, which entails a multiplier less than two, satisfies the cross check using the lodestar method"); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549

(S.D. Fla. 1988) ("most lodestar multiples awarded in cases like this are between 3 and 4"), *aff'd*, 899 F.2d 21 (11th Cir. 1990); *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679 (M.D. Ala. 1993) (recognizing that a multiplier of 3.122 was reasonable and appropriate to compensate class counsel for their work done on a contingency basis).[5]

Accordingly, the Agreed-Upon Fees are commensurate with fees and expenses awarded in comparable derivative settlements and should be approved by the Court.

### B.    The Incentive Awards Requested by Stockholders Are Reasonable

Certain Stockholders respectfully request that the Court approve service awards of $5,000 each, to be paid from the amount of fees awarded by the Court, in recognition of the substantial benefits they have helped create for Rayonier (the "Incentive Awards").  Stipulation ¶ 5.3; *see Lizondro-Garcia v. Kefi LLC*, 2014 WL 4996248, at *9 (S.D.N.Y. Oct. 7, 2014) (service awards common in stockholder representative actions); *In re Cendant Corp. Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2007) (service awards recognize plaintiffs' public service); *see also In re Presidential Life Secs.*, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) (incentive awards "need not be subject to intense scrutiny inasmuch as these funds will come out of the attorneys' fees").

## VI.    CONCLUSION

For all of the foregoing reasons, the Settlement represents a fair, reasonable, and adequate resolution of the Litigation and should be approved.  Further, the Agreed-Upon Fees, including the Incentive Awards to be paid from the fees awarded by the Court, are fair and reasonable and should be approved.  Stockholders' Counsel respectfully requests that the Court finally approve the Settlement and enter the Judgment filed concurrently herewith.

---

[5] *See also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052-54 (9th Cir. 2002) (listing risk multipliers for 24 settlements averaging 3.28); *Velez v. Novartis Pharms. Corp.*, 2010 WL 4877852, at *23 (S.D.N.Y. Nov. 30, 2010) (collecting cases approving multipliers from 2.09 to 5.5); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) (recognizing that multipliers of 3 to 5 typically applied in shareholder litigation).

Dated: September 11, 2018                Respectfully submitted,

*/s/ Joshua H. Eggnatz*
Joshua H. Eggnatz
**EGGNATZ, LOPATIN**
  **& PASCUCCI, LLP**
5400 S. University Drive, Suite 417
Davie, Florida 33328
Telephone: (954) 889-3359

*Local Counsel for Plaintiff*

**THE SHUMAN LAW FIRM**
Kip B. Shuman (Trial Counsel)
Rusty Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003

*Counsel for Plaintiff*

**STULL, STULL & BRODY**
Patrick Slyne (Trial Counsel)
Aaron Brody
6 East 45th Street, 5th Floor
New York, NY 10017
Telephone: (212) 687-7230

**KESSLER TOPAZ MELTZER**
  **& CHECK, LLP**
Eric L. Zagar
Robin Winchester
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 822-2209

**THE WEISER LAW FIRM, P.C.**
Robert B.Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677

**ROBBINS ARROYO LLP**

Craig W. Smith
Ashley R. Rifkin
Gregory E. Del Gaizo
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990

*Additional Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 11, 2018, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF, which will deliver the document to all counsel of record.


<u>*/s/ Joshua H. Eggnatz*</u>

Joshua H. Eggnatz

*Local Counsel for Plaintiff*